IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

FEDERAL   DEPOSIT   INSURANCE
CORPORATION,

     Plaintiff,

        v.

RAFAEL ARRILLAGA-TORRENS, JR.,
et al.

     Defendants.

CIVIL NO. 13-1328 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

The Federal Deposit and Insurance Corporation ("FDIC") as receiver of Eurobank, initiated this action against Eurobank's former Directors, related spouses and conjugal partnerships to recover approximately $55 Million in losses that it attributes to the Directors' gross negligence in approving twelve "obviously risky and deficiently underwritten" unpaid loans, "which they knew or should have known were extremely unlikely to be paid back" (Docket No. 1 at ¶ 81). As part of the same action, it sued Liberty Mutual Insurance Company, ACE Insurance Company, and XL Insurance Company, maintaining the insurers issued policies providing for coverage for the claims asserted against the Directors. Id. at ¶¶ 14, 15, 16.

Defendants answered the complaint denying liability (Docket Nos. 29, 31, 45, 48, and 200). Liberty cross claimed against the Directors, and counterclaimed against the FDIC (Docket No. 29 at pp. 22-49). Discovery followed (Docket No. 104). In the meantime, the parties filed various motions seeking judgment on the pleadings or summary judgment, all of which have been opposed, and with respect to most of which the parties have replied and surreplied. The motions address (1) different aspects of FDIC's gross negligence claim and corresponding affirmative defenses

(Category I); and (2) insurance coverage (Category II).  Motions to strike were filed under both categories.  All relevant issues have been exhaustively briefed.  The motions under Category I awaiting disposition are:

1.  The FDIC's "Motion of the Federal Deposit Insurance Corporation to Strike Certain Defenses Raised by the Director Defendants" (Docket No. 54), which the Directors except Arrillaga opposed (Docket No. 67).  The FDIC replied (Docket No. 69), and the Directors surreplied (Docket No. 77-1).  Later, Arrillaga opposed the FDIC-R's motion (Docket No. 78), and the FDIC replied (Docket No. 80).

2.  The FDIC's "Motion for Partial Summary Judgment" (Docket No. 364), which Rafael Arrillaga opposed (Docket No. 419).  The FDIC replied (Docket No. 455), and Arrillaga surreplied (Docket No. 485).

3.  Rafael Arrillaga's "Motion for Summary Judgment relating to the Statute of Limitations and Causation" (Docket No. 378), which the FDIC opposed (Docket No. 413).  Arrillaga replied (Docket No. 438), and the FDIC surreplied (Docket No. 478).

4.  Arrillaga's "Motion for Partial Summary Judgment as to the Jocar Loan" (Docket No. 367), which the FDIC opposed (Docket No. 397).  Arrillaga replied (Docket No. 441), and the FDIC surreplied (Docket No. 486).

5.  Arrillaga's "Motion for Partial Summary Judgment based on the FDIC's Admissions and Representations as to the Acor, Marat, and City Walk Loans" (Docket No. 369), which the FDIC opposed (Docket No. 406).  Arrillaga replied (Docket No. 443).  The FDIC surreplied (Docket No. 477).

6.  The FDIC's "Motion to Preclude Rafael Arrillaga-Torréns from using Certain
    Affidavits obtained in Lieu of Depositions" (Docket No. 354), which Arrillaga
    opposed (Docket No. 360), the FDIC replied (Docket No. 383) and Arrillaga
    submitted a surreply (Docket No. 387).

In the same way, the following motions correspond to Category II:

1.  "Liberty Mutual Insurance Company's Motion for Judgment on the Pleadings"
    (Docket No. 73), which the FDIC-R and the Directors opposed (Docket Nos.
    88 and 92, respectively). Arrillaga joined both responses (Docket No. 95).
    Liberty Mutual replied (Docket No. 102), and the FDIC and the Directors
    surreplied (Docket Nos. 117 and 119, respectively).

2.  The FDIC's "Motion for Partial Summary Judgment against Liberty Mutual
    Insurance Company and ACE Insurance Company" (Docket No. 358).   ACE
    and Liberty opposed (Docket No. 427).

3.  "XL Specialty Insurance Company's Motion for Partial Summary Judgment"
    (Docket No. 365), which the FDIC opposed (Docket No. 399).  XL replied
    (Docket No. 447), and the FDIC surreplied (Docket No. 476).

4.  In addition, the FDIC filed "Federal Deposit Insurance Corporation as Receiver
    for Eurobank's Opposition to Liberty Mutual Insurance Company and ACE
    Insurance Company's Motion for Summary Judgment" (Docket No. 404), and
    the Directors a "Director Defendants' Response in Opposition to Liberty-
    ACE's Joint Motion for Summary Judgment (Docket No. 410).  In response,
    Liberty and ACE filed "Liberty Mutual Insurance Company and ACE Insurance
    Company's Joint Reply to FDIC-R's and the Director Defendants' Responses

in Opposition to the Insurers' Motion for Summary Judgment (Docket No. 457), to which the FDIC surreplied (Docket No. 482).

5. "Liberty Mutual Insurance Company and ACE Insurance Company's Joint Motion to Strike" [the FDIC-R's Sur-reply at Docket No. 482] (Docket No. 487), which the FDIC opposed (Docket No. 490).

Careful evaluation of these motions leads the court to conclude that the action cannot be dismissed at this stage on timeliness grounds; some of the affirmative defenses are not amenable to resolution through summary judgment; there are grounds to conclude that Liberty's and ACE's policies are ambiguous; and that XL's policy should be considered an excess policy. The sworn statements under penalty of perjury procured -but not disclosed- will not be excluded, but must be produced for an *in camera* inspection. To facilitate review, the materials have been organized under the following topics:

| I. | BACKGROUND…………………………………………… | 5 |
|---|---|---|
| II. | STANDARD OF REVIEW ……………………………… | 8 |
| III. | DISCUSSION…………………………………………….. | 9 |
| | A. Timeliness……………………………………………….. | 9 |
| | B. Loans………………………………………………….. | 21 |
| | 1. Acor/Marat Loans………………………………… | 21 |
| | a. Acor Loan……………………………………….. | 21 |
| | b. Marat Loan……………………………………… | 23 |
| | c. Contentions……………………………………… | 24 |
| | 2. Jocar Loan………………………………………….. | 28 |
| | C. FDIC's Role……………………………….………….. | 32 |
| | a. Comparative Negligence/Mitigation ………….. | 34 |
| | b. Tortfeasors……………………………………….. | 35 |
| | c. Genesis/Functions……………………………….. | 36 |

| | d. | O'Melveny……………………………………… | 37 |
| | e. | FTCA……………………………………………. | 40 |
| | f. | Setoff…………………………………………….. | 41 |
| | g. | Dividing Line………………………………… | 44 |
| D. | Great Recession………..……………………………... | | 46 |
| E. | Articles of Incorporation……………………………… | | 51 |
| F. | Insurers……………………………………………….. | | 52 |
| | 1. | Background…………………………………….. | 52 |
| | 2. | Legal Standard……………………………….... | 54 |
| | 3. | Analysis……………………………………….. | 54 |
| | | a. Insured v. Insured Exclusion………………….. | 54 |
| | | b. Professional Services Exclusion……………… | 62 |
| | | c. Disposition…………………………………… | 65 |
| | | d. Excess Coverage……………………………… | 66 |
| G. | Third-Party Affidavits/Depositions……………..…….. | | 70 |
| IV. | CONCLUSION………………………………………… | | 76 |

# I.     BACKGROUND

Eurobank was established in 1980 as an uninsured trust company named Española de Finanzas Trust Company (Docket No. 1 at ¶ 20).  It became an FDIC-insured state nonmember bank in 1987, assuming its current name in 1993. Id.   In 2001, it became a wholly-owned subsidiary of EuroBancshares, Inc., a one-bank holding company.  Id.

According to the FDIC, in the early to mid-2000s, Eurobank began aggressively growing its commercial real estate ("CRE") portfolio, including acquisition, development, and construction ("ADC") loans, despite recognition that these loans carried a higher risk for the bank.  From June 30, 2005 to June 30, 2009, the ADC portfolio grew by 240%, over six times the growth rate of its peer group for the same period.  Id. at ¶ 21.

<u>Federal Deposit Insurance Corporation</u> v. <u>Arrillaga-Torréns</u> <i>et al.</i>
Civil No. 13-1328 (PAD)
Opinion and Order
Page 6

The growth of the CRE and ADC portfolios was largely responsible for the bank's assets growing from $1.3 Million as of December 31, 2003, to $2.9 Billion by December 31, 2008.  <u>Id.</u> Yet from 2004 to 2007, the bank's income had plummeted 80%, with charge-offs increasing 250%. <u>Id.</u> at ¶ 28.  From 2005 to 2008, various reports mentioned weaknesses in internal loan review, risk management, and lax underwriting and credit administration.   In 2009, Eurobank's Directors consented to entry of a Cease and Desist Order, requiring the bank to cease and desist from certain unsafe and unsound banking practices, such as:

- operating with lax underwriting, poor credit administration practices, and ineffective loan review practices;

- operating with an excessive level of adversely classified loans and/or delinquent loans;

- operating with inadequate capital and reserves in relation to the kind and quality of assets held by the bank;

-  operating with inadequate internal controls. <u>Id.</u> at ¶ 32.

On April 30, 2010, the Office of the Commissioner of Financial Institutions of Puerto Rico closed Eurobank and appointed the FDIC as Receiver.  <u>Id.</u> at ¶ 1.  For the FDIC, Eurobank's desire for rapid growth caused the bank to abandon sound underwriting, resulting in numerous collateral-dependent loans with no alternative source of repayment to borrowers who had no equity in the projects and no demonstrated ability to repay the loans in the precarious lending environment in which the bank was operating.  <u>Id.</u> at ¶ 22.  It says such abandonment led to approval of the loans for which it seeks recovery here, namely:

| <u>BORROWER</u> | <u>APPROVAL DATE</u> | <u>LOSS (Millions)</u>[1] |
| --- | --- | --- |
| 1.   Skylofts | May 6, 2006 | $4.73* |

---

[1] The star symbol (*) follows the rounded amount of the asserted loss for that specific borrower listed in the table.

| 2.  | Skylofts   | June 27, 2007      |          |
| --- | ---------- | ------------------ | -------- |
| 3.  | Ciudadela  | April 24, 2006     | $19.51   |
| 4.  | Hillstone  | September 27, 2006 | $4.13*   |
| 5.  | Hillstone  | September 29, 2006 |          |
| 6.  | Acor       | March 19, 2007     | $6.22*   |
| 7.  | Acor       | March 25, 2008     |          |
| 8.  | Acor       | February 19, 2009  |          |
| 9.  | Jocar      | December 21, 2007  | $4.69    |
| 10. | City Walk  | December 28, 2007  | $4.81    |
| 11. | Marat      | November 24, 2008  | $11.38*  |
| 12. | Marat      | December 22, 2008  |          |
| **TOTAL** | | | **$55.47** |

Id. at ¶ 34.

To justify recovery, the FDIC contends the Directors were grossly negligent in approving these loans, breaching their fiduciary duty of care to the bank in routinely overlooking extreme and obvious departures from sound underwriting practices while ignoring the obvious risks the loans posed.  Id. at ¶ 35.  The Directors deny liability, challenging the FDIC's assertion of entitlement to recovery.  Liberty and ACE deny any obligation to provide coverage, whereas XL questions the view that it should be considered a primary insurer here.  The contentions and challenges must be viewed in the context of a motion for judgment on the pleadings, and motions for summary judgment.

## II.     STANDARD OF REVIEW

The standard of review of a motion for judgment on the pleadings is the same as that for a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 96 (1st Cir. 2014); Marrero-Gutiérrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).  To survive dismissal, a complaint must allege a plausible entitlement to relief.  Rodríguez-Vives v. Puerto Rico Firefighters Corps., 743 F.3d 278, 283 (1st Cir. 2014); Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013); Rodríguez-Ortiz v. Margo Caribe, 490 F.3d 92, 95 (1st Cir. 2007).

Plausibility involves a context-specific task calling on courts to examine the complaint as a whole, separating factual allegations (which must be accepted as true) from conclusory allegations (which need not be credited).  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013); Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012).  All reasonable inferences from well-pleaded facts must be drawn in the pleader's favor.  Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68 (1st Cir. 2014); García-Catalán, 734 F.3d at 102-103.  If, so construed, the combined allegations plead facts enough to nudge the claim across the line from conceivable to plausible, the case should not be dismissed under Fed.R.Civ.P. 12(c).

In turn, summary judgment is appropriate when the pleadings, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See, Fed. R. Civ. P. 56(c). A factual dispute is material "if it potentially affects the outcome of the case." Vega-Rodríguez v. P.R.T.C., 110 F.3d 174, 178 (1st Cir. 1997).  It is genuine "if the probative evidence on it conflicts." Id. (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden may be discharged by "showing -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. at 325. All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013).

To resist summary judgment, the non-movant must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Inds. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A factual dispute must "be built on a solid foundation . . . constructed from materials of evidentiary quality." Nieves-Romero v. United States, 715 F.3d 375, 378 (1st Cir. 2013). For the same reason, conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported motion for summary judgment. Id.

## III.   DISCUSSION

### A. Timeliness

Rafael Arrillaga-Torréns, the former President of Eurobank's Board of Directors, alleges the action is time-barred (Docket No. 378 at p. 1). The Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183 (1989) ("FIRREA")(codified in scattered sections of 12 U.S.C.), provides a three-year federal repose period for the FDIC to bring claims after it takes over as receiver, provided those claims had not expired before the date of the receivership. 12 U.S.C. § 1821(d)(14)(A)(ii)(I). State law determines when claims accrue, and whether they have expired. FDIC v. James T. Barnes of Puerto Rico, Inc., 834 F.Supp. 543, 547 (D.P.R. 1993). Receivership does not revive time-barred claims. FDIC v. Torrefacción Café

Cialitos, Inc., 62 F.3d 439, 442 (1st Cir. 1995).  If the state limitations period has not yet run when the FDIC steps in, the federal limitations period will apply.  Id.

Arrillaga asserts that all claims had expired before the FDIC was appointed receiver in April 2010 (Docket No. 438 at p. 21 n.18).  He argues that (1) he is being sued for alleged "gross negligence;" (2) in Puerto Rico, claims arising from fault or negligence are subject to the one-year limitations period set in Article 1868(3) of the Civil Code, P.R. Laws Ann. tit. 31 § 5298(2); and (3) because the loans were approved between 2006 and 2009, the claims they correspond to had already expired by the time the FDIC was appointed receiver, and therefore, are time-barred (Docket No. 378 at p. 3).

The FDIC contends the action is not so barred, pointing out that Article 1868 does not apply (Docket No. 413 at pp. 13-14).  Instead, it directs the court's attention to Article 47 of the Code of Civil Procedure (Código de Enjuiciamiento Civil) of Puerto Rico, P.R. Laws Ann. tit. 32 § 261, which applies to "actions against directors or stockholders of a corporation, to recover a penalty of forfeiture imposed," or "to enforce a liability created by law." Id. at p. 14.  It claims it seeks to enforce a liability created by Article 4.03 of the General Corporations Act of Puerto Rico, Law No. 164 of December 16, 2009, P.R. Laws Ann. tit. 14 § 3563.  And as Article 47 provides those actions "must be brought within three years after discovery by the aggrieved party of the facts upon which the penalty or forfeiture attached or the liability was created," it reasons that there is no timeliness problem.  Id.

Article 1868 of the Civil Code is a general statute, whereas Article 47 of the Code of Civil Procedure is a special statute, limited to actions against directors and stockholders of a corporation. A special law on a particular subject prevails over any other provision of a general nature.  Córdova & Simonpietri v. Crown American, 112 D.P.R. 797, 800 (1982); Rosa-Resto v. Rodríguez-Solís,

111 D.P.R. 89, 94 (1981).  Thus, Article 47 applies.  But Arrillaga points out the article was adopted from California and Idaho, where the distinction between common law and statutory law precludes application of similar statutes to actions originating in common law, and a similar distinction should be drawn here to reach the same result because, in his view, this action originates in common law.  (Docket No. 378 at pp. 4-5; Docket No. 438 at pp. 10-16).

Puerto Rico's legal system arises out of and reflects, not traditional British common law, but a tradition stemming from European civil codes and Roman law. See, Puerto Rico v. Sánchez Valle, 576 U.S. ----, 136 S.Ct. 1863, 1877 (2016)(Breyer, J., dissenting)(so noting).  By extension, Puerto Rico's laws are to be "governed . . . by the civil law system," with roots in the Spanish legal tradition, not by the "common-law principles" inherent in "American doctrines and theories" of law.  Id. at 1884 (quoting Valle v. American Int'l Ins. Co., 8 P.R. Offic. Trans. 735, 736-738 (1979)).

In Spain, common law means the Civil Code, for it applies throughout the country as a whole, supplementing local law enacted for Spanish political communities and special legislation. José Puig Brutau, *Fundamentos de Derecho Civil, Tomo Preliminar*, 113-118 (Bosch 1989). The understanding originated in events dating back to the Roman Empire.  At the end of the Empire, one law remained, that of the Romans, expanded and enlarged, which had effaced all others and become the universal law of the Empire.  Marcel Planiol, *Treatise on the Civil Law* (Vol. 1), 17 (1939).  The Empire fragmented into different political communities, each of which enacted local decrees or laws.  However, in the ensuing dynamics the Roman *jus civile* became *jus commune* or common law.  Antonio Hernández Gil, *Conceptos Jurídicos Fundamentales*, 276-281 (Espasa-Calpe 1987); Marcel Planiol, *op. cit.* at pp. 16-17.  In this way, the Civil Code developed into common law, and as such is considered in Puerto Rico.  See, López v. Western Auto, 171 D.P.R.

185, 196 (2007)(pointing out that the common law's norms of liability are those of the Civil Code)(quoting Cortijo Walker v. Fuentes Fluviales, 91 D.P.R. 574, 578 (1964)); San José Realty, S.E. v. El Fénix de P.R., 157 D.P.R. 427, 453 (2002)(referring to the Civil Code as common law).

In line with these developments, a sister court in this District found unpersuasive the attempt to distinguish between statutory law and common law in a similar context, concluding that, either way, the liability at issue arises under law.  See, W. Holding Co., Inc. v. Chartis Ins. Co., 904 F.Supp.2d 169, 180 (D.P.R. 2012).  And thus, it rejected the argument that the three-year period of Article 47 does not apply to an action brought by the FDIC against former directors and officers of a failed bank, because the definition of "create" includes "to bring about something," including liability by a legislative act; in other words, a statute.  W. Holding Co., Ins. v. Chartis Ins. Co., 2012 WL 6197037, *1-*2 (D.P.R. December 12, 2012).  Such is the case here.[2]

FIRREA imposes personal liability on directors or officers of insured depository institutions for gross negligence.  See, 12 U.S.C. § 1821 (k).  In turn, Article 4.03 of the General Corporation Act provides that:

> [t]he directors and officers shall be bound to dedicate to the affairs of the corporation and to the exercise of their duties the attention and care which in a similar position and under analogous circumstances a responsible and competent director or officer would execute in applying his/her business judgment in good faith or his/her best judgment in the case of nonprofit corporations.  Only **gross negligence** in the exercise

---

[2]  In absence of specific legislation making available a damages action against a particular person or group, in Puerto Rico a damage claim is subject to the general norm set in Article 1802 of the Civil Code, P.R. Laws Ann. tit. 31 § 5141.  See, Consejo v. Jetter, 169 D.P.R. 643, 657 (2006)(so recognizing).  The Civil Code is a law.  See, A.C.A.A. v. Reyes-Diaz, 2012 WL 2571237,*5 (P.R. Court of Appeals May 25, 2012)(so noting).  It derived from the Spanish Civil Code of 1888, approved as revised by Law No. 26 of 1889 and extended to Puerto Rico during Spanish rule by the Royal Decree of July 31, 1889.  After the United States invaded Puerto Rico in 1898 and Spain ceded the Island to the United States by way of the Treaty of Paris (ratified in 1899), a special commission recommended retention of the Spanish Civil Code with amendments.  The Legislature agreed, approving what became the Puerto Rico Civil Code on March 1, 1902.  It went into effect on July 1, 1902.  See, Ortega v. Lara, 202 U.S. 339, 343 (1906)(referring to Code's effectiveness date); Busó v. Busó, 18 D.P.R. 897 (1912)(same).  A revised version was approved in 1930, P.R. Laws Ann. tit. 31 § 1, becoming effective the same year.  José A. Rivera García, *Las Mejoras Hechas por el Usufructuario o el Arrendatario en la Cosa Objeto del Usufructo o Arrendamiento*, 37 Rev.Der.P.R. 309, 338-341 (1998), and Luis Muñoz Morales, *El Código Civil de Puerto Rico, Breve Reseña Histórica*, 1 Rev.Jur.UPR 75 (1932), trace the Civil Code's background in light of surrounding historical events.  The general norm of Article 1802 may be modified by legislation.

> of the duties and obligations mentioned above shall result in personal
> liability.

P.R. Laws Ann. tit. 14 § 3563 (emphasis added).  The text is similar to that of Article 4.03 of the General Corporations Act of 1995, Law No. 144 of August 10, 1995, with the exception of the term "best judgment," which was adopted in 2009.  See, Carlos Díaz-Olivo, *Corporaciones: Tratado sobre Derecho Corporativo*, 239-240 n.363 (2016)(so noting).  It takes into account the duty of care – the degree of diligence – expected from directors and officers, Multinational Ins. v. Benítez, 193 D.P.R. 67, 78 (2015), and incorporates the Business Judgment Rule.  Rivera Sanfeliz v. Junta, 193 D.P.R. 38, 53 n.13 (2015).  See also; Félix J. Montañez-Miranda, *Lealtad Fiduciaria de Directores y Oficiales*, 95-96 (SITUM 2014)(discussing Business Judgment Rule as a component of Article 4.03); Luis M. Negrón-Portillo, *Derecho Corporativo Puertorriqueño*, 214 (2d ed. 1996)(pointing out that Business Judgment Rule underpins Article 4.03).  No such provision existed in the general corporation statutes enacted in Puerto Rico prior to 1995, namely the General Corporation Act of 1902, Law of March 1, 1902; the General Corporation Act of 1911, Law No. 30 of March 9, 1911; and the General Corporation Act of 1956, Law No. 144 of August 10, 1956.

The Business Judgment Rule serves as a tool for judicial review.  Dennis J. Block et al., *The Business Judgment Rule, Fiduciary Duties of Corporate Directors*, 11 (2009).  It shields directors from liability under certain circumstances, creating a presumption in their favor.  Id.  Its development as a principle of American jurisprudence has been traced back to the 1829 decision by the Louisiana Supreme Court in Percy v. Millaudan.  Id. at 26.  But its role as a component of corporate governance in Puerto Rico was unclear until 1995.

Prior to enactment of the General Corporations Act of 1995, the Puerto Rico Supreme Court had addressed corporate administrators' fiduciary obligations in <u>Turner</u> v. <u>Registrador</u>, 22 D.P.R. 573 (1915), and in <u>Epstein</u> v. <u>F & F Mortgage, Corp.</u>, 106 D.P.R. 211 (1977).  In <u>Turner</u>, the president of the corporation purchased for himself the corporation's real estate in a mortgage foreclosure action initiated by the creditor bank.  The Registrar of Property refused to record the transaction, pointing out that it was prohibited by Article 1362 of the Civil Code of 1902 (corresponding to current Article 1348, P.R. Laws Ann. tit. 31 § 3773).  As relevant, the article states that agents cannot purchase property, the administration or sale of which may have been entrusted to them.  P.R. Laws Ann. tit. 31 § 3773(2).  The Supreme Court held that the president of a corporation is not an agent *per se* of the corporation over which he presides, and that in general, the corporation could nullify the sale to board members, which had not occurred in the case.  Therefore, it reversed the Registrar's refusal to record the purchase.

In <u>Epstein</u>, a stockholder-director sought the liquidation of the corporation.  The defendant, a stockholder-director, counterclaimed seeking damages based on violation of plaintiff's fiduciary duties arising from the creation of corporate entities that would be competing with the corporation whose liquidation he sought.  The Supreme Court concluded that board directors owe fiduciary duties to the corporation, and relying on Delaware caselaw, held that those duties do not prevent a director from engaging in businesses similar to those of the corporation, provided she acts in good faith and does not interfere with the corporation's business in absence of a covenant not to compete. <u>Epstein</u>, 106 D.P.R. at 224.

As one commentator observed, there was no clarity as to the diligence standard to be applied to corporate administrators.  Carlos E. Díaz Olivo, *La responsabilidad de los directores y oficiales de la corporación, un análisis comparado: Estados Unidos, España y Puerto Rico*, 52

Rev.Col.Abog. 173, 208 (1991).  Different alternatives existed, running from simple negligence to gross negligence or something else.  See, Atherton v. FDIC, 519 U.S. 213, 227 (1997)(mentioning disparities in corporate governance standards).  The enactment of Article 4.03 in 1995 established the standard to be relied on: gross negligence, the floor set in FIRREA.  Id. (describing the "gross negligence" standard set in the federal statute).  In consequence, the institutional decision underlying its adoption was made by the Legislature -not a court- laying the foundation for application of the three-year period set in Article 47 of the Code of Civil Procedure.[3]

Arrillaga contends that the three-year period is one of caducity (Docket No. 378 at p. 6). He argues that the allegedly "grossly negligent" conduct occurred when he voted to approve the loans, and in consequence, asserts that because the Skylofts I Loan was approved on March 6, 2006, the La Ciudadela loan was approved on April 24, 2006, the Hillstone I loan was approved on September 27, 2006, and the Acor I loan was approved on March 19, 2006, any action to recover losses arising from those loans would be time-barred.  Id. at pp. 6-7.

In Puerto Rico, limitation periods may be classified as periods of caducity and periods of prescription. Both create periods within which actions must be initiated.  A period of caducity (1) extinguishes the obligation once the period has elapsed; (2) admits no interruption; (3) can be raised as a defense by the court *ex-officio judicis*; and (4) begins running irrespective of whether the potential plaintiff has discovered the facts needed to support the claim.  Ruiz v. Ambush, 25 F.Supp.3d 211, 214 (D.P.R. 2014).[4]

---

[3] Arrillaga argues this conclusion or interpretation subsumes "to recover a penalty or forfeiture" into "liability created by law," rendering it superfluous in violation of cardinal rules of statutory construction (Docket No. 438 at p. 11, n.5).  Not so, for canons of construction indicate that terms connected by a disjunctive be given separate meanings.  See, Garcia v. United States, 469 U.S. 70, 75 (1985)(so noting); Pueblo ex rel I.C.C., 109 D.P.R. 483, 484 (1980)(applying principle).

[4] In this connection, see González-Rosado v. Echevarría-Muñiz, 169 D.P.R. 554, 560-561 (2006)(dismissing action challenging acknowledgment of paternity subject to a three-month caducity period, even though plaintiff lacked knowledge of facts needed to support action before lapse of period).

By contrast, lapse of a prescriptive period extinguishes the action rather than the obligation itself.  It may be interrupted, running anew from interruption.  Being an affirmative defense, it must be timely raised.  Knowledge of relevant facts – and as more fully discussed below, discovery of those facts – marks the starting point for its operation.  As the period set in Article 47 runs from discovery, it is one of prescription not of caducity.  See, Díaz-Olivo, *Corporaciones* at p. 439 (characterizing the Article 47 period as a prescriptive period).

Arrillaga alleges that the discovery rule does not apply to a claim based on an alleged breach of duty of care in making a loan, for the rule was adopted for tort claims, and no Puerto Rico court has ever applied it to claims like the FDIC's, or even to a claim whose timeliness might properly be controlled by Article 47 (Docket No. 438 at pp. 18-19).  That is not what the statute states.  "If the language of a statute . . . has a plain and ordinary meaning, we need look no further and should apply [the statute] as it is written."  United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241-242 (1989).  In the same way, the period starts running with knowledge – and by extension, discovery – of the facts upon which liability is based.  See, Díaz-Olivo, *Corporaciones* at p. 439 (pointing out that the period runs from knowledge of the facts giving rise to liability).

Arrillaga claims the alleged negligence could have been discovered more than three years before the FDIC was appointed receiver (Docket No. 438 at p. 19).  He maintains that improper loan approvals cause an immediate injury that is immediately discoverable.  Id.  The FDIC counters that pursuant to the adverse domination doctrine, the limitations period was tolled until it assumed receivership of Eurobank (Docket No. 413 at p. 23).

Adverse domination is an equitable doctrine which operates to toll the statute of limitations for a corporation's claims against its officers or directors when the persons in charge of the corporation cannot be expected to pursue claims adverse to their own interests.  W. Holding, 904

F.Supp.2d at 180.  As a judicial doctrine, it seems to have originated in <u>FDIC</u> v. <u>Bird</u>, 516 F.Supp. 647 (D.P.R. 1981), where the court crafted the principle that control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to initiate any action contrary to their own interests.  <u>Id.</u> at 652. But it was subsequently adopted by other courts, including the First Circuit.  <u>See</u>, <u>FDIC</u> v. <u>P.L.M. Intern., Inc.</u>, 834 F.2d 248 (1st Cir. 1987).

The FDIC states the corporate board was in control of Eurobank, and it was not until it was appointed receiver on April 30, 2010, that the board was stripped of control.  To that end, it asks the court to apply the adverse domination doctrine to conclude that the statute of limitations was tolled until April 30 (Docket No. 413 at pp. 23-31).  But Arrillaga alleges that reliance on the adverse domination doctrine is misplaced because no court in Puerto Rico has even mentioned this "purported doctrine," let alone "purported to adopt it" (Docket No. 438 at p. 22).  He argues that Puerto Rico looks to Delaware law in resolving open issues of corporate law, Delaware has not adopted this "purported doctrine," and two district courts in Delaware have held it doubtful that Delaware ever would.  <u>Id.</u> at p. 23.

Be that as it may, in 1997 the United States Supreme Court limited the use of federal common law.  <u>O'Melveny & Myers</u> v. <u>FDIC</u>, 512 U.S. 79, 83 (1997).  <u>Bird</u> does not cite to Puerto Rican statutes or cases, and uses the term "federal common law."  And so <u>O'Melveny</u> would appear to foreclose reliance on the adverse domination doctrine, at least to the extent the doctrine is informed by nothing but federal caselaw.  Yet the Puerto Rico Civil Code independently recognizes knowledge as a predicate to proper application of prescriptive periods, and a corporate board's behavior, albeit not the bare fact that it controls the corporation, may effectively operate to impede discovery of facts needed to trigger running of a limitations period.  So the fundamental

concerns underlying the adverse domination doctrine are not foreign to Puerto Rico law.  See, FDIC v. Carlson, 698 F.Supp. 178, 179 (D. Minn. 1988)(stating that underlying rationale for adverse domination doctrine is a belief that while in control of a bank, the directors and officers can effectively disguise any wrongdoing).

In Puerto Rico, limitation of actions is not a procedural but a substantive matter.  Vera v. Dr. Bravo, 161 D.P.R. 308, 321 (2004); Olmo v. Young & Rubicam of P.R., Inc., 110 D.P.R. 740, 742-743 (1981).  The clock to initiate an action subject to a prescriptive period starts ticking from the time the aggrieved person has knowledge of the existence of her claim.  Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 215 (1st Cir. 2016).  The principle was enacted into the Spanish Civil Code of 1888, which as revised became effective in Puerto Rico in 1890, and was maintained in the Puerto Rico Civil Code, which as discussed above, is based on the Spanish Civil Code.[5]

To have knowledge that he has a claim, a person needs to be aware not only that she has been injured, but also needs to know who is (or may be) responsible for that injury.  Rivera-Carrasquillo, 812 F.3d at 215-216.  The Puerto Rico Supreme Court recognizes two types of knowledge as sufficient to start the clock.  First, a plaintiff may have actual knowledge of both the injury and of the identity of the person who caused it.  In that case, the limitations period begins to run on the date a plaintiff obtains this knowledge.  Id. at 216.  Second, alternatively, a plaintiff is deemed to be on notice of her cause of action if she is aware of certain facts that, with the exercise of due diligence, should lead her to acquire actual knowledge of it.

---

[5] Extinctive prescription originated in the Emperor Theodosius II's Constitution of 424 a. C.  Federico Puig Peña, *Compendio de Derecho Civil Español*, 682 (Ed. Pirámide 1976); Luis Díez Picazo, *La Prescripción en el Código Civil*, 17 (Bosh 1964); Marcel Planiol, op.cit. at p. 347.  In early Roman law, actions were perpetual except for a small number, which were temporary.  The debtor could not defend himself by invoking the creditor's inaction, no matter how long it lasted.  The imperial constitution thus established a means of defense against perpetual actions with the concept of *praescriptio longissimi temporis*.  Díez Picazo, op. cit. at p. 17; Marcel Planiol, op. cit.  The concept evolved to be codified in Continental European countries, including Spain.

The test for this so-called "deemed knowledge" is an objective one.  Under Puerto Rico law, deemed knowledge is essentially parlance for the discovery rule, which stands for the proposition that the statute of limitations does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit suit.  Id.  With that in mind, the statute of limitations begins running at the time a reasonably diligent person would discover sufficient facts to allow her to realize that she had been injured and to identify the party responsible for that injury.  Id.  The rationale being, that once a plaintiff comes into that knowledge she can file suit.  Id.

Notice of the injury occurs when there exists some outward or physical signs through which the aggrieved party may become aware and realize that she has suffered an injurious after effect, which, when known, becomes a damage even if at the time its full scope and extent cannot be weighed.  Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18-19 (1st Cir. 2000).  If the ignorance is due to lack of diligence of the injured party, the limitations period runs from the time she should have known through reasonable inquiry.  Pan American Grain, Inc. v. De la Cruz, 2013 WL 496142, *2 (D.P.R. Jan. 31, 2013).  If the ignorance is attributable to the defendant, the statute of limitations will be tolled.  Rivera-Carrasquillo v.  Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 216 n.3 (1st Cir. 2016).  It is not the label of an action that dictates which principle applies, but the facts underlying the action.

Arrillaga argues that by the FDIC-R's assertions, the alleged wrongdoing and injury were simultaneous and readily apparent when the loans were approved and made (Docket No. 438 at p. 20).  In like manner, he states, persons capable of bringing suit knew or should have known of Arrillaga's gross negligence for ". . . [d]erivative actions are brought every day by shareholders of companies who claim that directors breached fiduciary duties. . ." Id. at p. 22.  He maintains that

this is not a case where a medical patient could not immediately know she had been injured, or could not immediately identify which doctor had injured her. Id. at p. 25.  He adds that director approval of bad loans is not something that cannot be discovered until default occurs where nothing is done to conceal the circumstances surrounding loan approvals, and no concealment was alleged here.  Id.  Hence, he posits that "for limitations purposes," this case "is analogous to the case of a patient who wakes up after surgery to discover that the wrong leg was amputated." Id.  But is it?

The FDIC points out that the only components of the losses sought which were manifested prior to the Bank's failure were the pre-failure charge-offs of the Acor and Ciudadela loans (Docket No. 413 at p. 21).  Those events took place on January 20 and September 30, 2009.  Id.  If so, the charge-offs occurred within three years of the FDIC's appointment as Receiver.  Otherwise, defendants did not report charge-offs in the publicly available call reports the Bank submitted to the FDIC. Id. at p. 22.  Similarly, most of the loans on which the FDIC seeks recovery had interest reserves, which guaranteed they would not be reflected as current for certain periods.  Id.  Several of the loans had their interest reserves replenished, thus ensuring they would not fall into delinquency.  Id.  The loans were only adversely classified as "sub-standard" on the following dates:

| | |
|---|---|
| Acor: | May 15, 2008 |
| Skylofts: | November 23, 2008 |
| Hillstone: | November 24, 2008 |
| Marat: | December 31, 2008 |
| Ciudadela: | July 6, 2009 |
| Jocar: | October 31, 2009 |

On this record, the court need not announce that the claim accrues when the money leaves the bank; when the loans were adversely classified as substandard; when the loans went into default; or some other date effectively precluding dismissal or timeliness grounds.  The question of when a diligent plaintiff should have been able to figure out if there had been a breach of fiduciary duties under the circumstances of this case is for the jury to decide.  The parties' positions must be tested at trial.

### B.  Loans

#### 1.  Acor/Marat Loans

The FDIC seeks to collect $28.25 Million in losses relating to the Acor and Marat loans.  Part of the proceeds of these loans were used to pay-off different and older delinquent loans.  Arrillaga alleges that approximately $15.95 Million was disbursed pursuant to the original approvals, and some $12.3 Million were disbursed pursuant to renewal decisions.  He claims that any recovery must be limited to "new money" disbursed (Docket No. 399 at pp. 3-5; Docket No. 443 at pp. 3-5, 10-12).  On that basis, he asks the court to enter summary judgment reducing the calculation of damages attributed to those two loans (Docket No. 443 at p. 10).  The FDIC counters that viewing the record in the light most hospitable to it, and making every reasonable inference in its favor, a reasonable juror would hold for the FDIC.  As such, the issue raises a question for the jury rather than for summary judgment (Docket No. 406 at p. 8).

#### a.  Acor Loan

In 2000, Eurobank approved a $5.5 Million loan to Acor, SE, to be used to develop the Villas de Hato Tejas project, entailing construction of 192 walk up/walk down type apartment units (Docket No. 406 at p. 8).  The project was scheduled for completion in two years.  Id.  In 2004, the bank's internal auditor wrote an audit report for the Board, pointing out that:

- The interest reserve that had been assigned to pay the interest of the loan was exhausted well before the project was completed. The bank then began diverting funds that were to be used exclusively for construction to pay the interest of the loan. The audit noted that the practice could result in the developer running out of money before finishing the project.

- The amount of the loan disbursed was higher than the amount authorized and secured by the mortgage note, an unsecured overdraft exposing the bank to a loss.

- The bank was supposed to receive 90% of each unit sold as repayment of its principal, but on the sale of three units the bank received less, and the amounts that were received were mostly allocated to pay interest.

(Docket No. 406 at p. 9). As of January 2007, Acor had exhausted its interest reserve, depleted its funds for construction, was overdrawn by $1.3 Million, and was over 30 days delinquent, owing the November, December and January interest payments (Docket No. 406 at p. 10). The same month, the head of the bank's Construction Department requested that the old Acor loan of the year 2000, whose balance had increased to $7.8 Million, be refinanced while providing an additional $2 Million. Id. at pp. 10-11.

The Board approved the proposed deal. At the closing in March 2007, the transaction was booked as a new loan (Docket No. 406 at p. 11). The old Acor loan was paid off and canceled. Id. The past due interests were paid off and booked as earned (i.e. paid by the bank to itself but entered as earnings). Id. Increases of $2.56 Million and $.69 Million were approved in March 2008 and in January 2009 respectively. Acor never finished construction of the units, and never paid off the loan. Id. at pp. 12-13.

     b.  <u>Marat Loan</u>

Marat is linked to Clema Development Corp., which intended to build a residential complex within a golf resort in Caguas, Puerto Rico (Docket No. 369 at p. 6).  The principal of both Clema and Marat is Cleofe Rubí.  His partner was Zoila Levis.  The project was to be developed in three stages: land acquisition, land development, and unit construction.  <u>Id.</u>  In 2004, the bank approved a $6 Million loan for land acquisition, along with a $1.528 Million interest reserve.  <u>Id.</u>  The Land Loan and the Interest Loan eventually matured, but were not paid back as agreed (Docket No. 406 at p. 12).  Instead of collecting the money, the bank renewed the Land Loan and increased the Interest Loan by $1.053 Million.  <u>Id.</u>  This would pay interest on the Land Loan and keep it current. <u>Id.</u>  In 2006, the bank granted Clema a $2,150,000.00 Land Development Loan (Docket No. 406 at p. 12; Docket No. 409 at ¶¶ 5, 55).  By the end of 2007, however, the Clema Interest Loan had begun to run out (Docket No. 406 at p. 12; Docket No. 409 at ¶ 57).

Both the Land Loan and the Interest Loan became delinquent (Docket No. 406 at p. 12; Docket No. 409 at ¶ 57).  Rather than paying, Rubí requested a new $13.3 Million Construction Loan for Clema to restructure Clema's prior loans and to increase the peak to include the cost of construction and development (Docket No. 369 at p. 6).  The loan was conditioned on the injection of $3 Million in capital (Docket No. 406 at pp. 13-14; Docket No. 409 at ¶ 62).  The proposed loan included $1,605,746.00 earmarked to pay interest (an interest reserve), ensuring that Rubí would not have to do so until construction was finished (Docket No. 409 at ¶ 62).

Rubí's credit score on file was "weak," with a score making him unlikely to qualify for a non-subprime credit card (Docket No. 409 at ¶ 64).  He was unable to raise the $3 Million in cash and therefore proposed to contribute $2 Million.  Subsequently, he could not raise the $2 Million and the conditions were amended to require no equity injection.  <u>Id.</u> at ¶ 66.  Zoila Levis' personal

guaranty would only be retained on a "best effort" basis.  Id. at ¶ 68.  Moreover, the peak of the loan was increased to $15.2 Million.  Id.

On December 22, 2008, the loan was amended to $15.2 Million; $8,014,551.00 was to restructure the pre-existing Land Loans that had been approved in 2004 and 2006, and $7,185,449.00 to finance the construction phase of the project (Docket No. 369 at p. 7).[6]  On December 30, 2008, the Credit Committee agreed to release Levis from her personal guarantees on all Clema loans (Docket No. 409 at ¶ 69).  The same day, Rubí requested that the loan be made to a new entity: Marat LLC. Id. at ¶ 70.

On December 31, 2008, the transaction closed.  A new credit agreement was executed with Marat, describing a credit facility of up to $28,044,351.00 with a peak amount of $15.2 Million.  The $15.2 Million included approximately $8,150,000.00 to refinance the Clema Land and Development Loans from 2004 and 2006.  Id. at ¶¶ 71-73.

c.  Contentions

In the main, Arrillaga draws a distinction between new loans and renewals.  He claims the FDIC never made any allegation putting at issue the Original Approvals, and that any such allegation would be untimely now (Docket No. 443 at p. 6).  For the same reason, he argues that recovery should be limited to money disbursed over and beyond amounts disbursed when the loans were initially approved.  Id. at p. 7.  He maintains there is no authority for the proposition that by only attacking the renewal decisions the FDIC can reach back in time and collect money that the Original Approvals caused to be disbursed.  Id. at pp. 7-8.  And thus he would limit Acor recovery

---

[6] The bank first required Rubí to contribute $3 Million in equity contribution at closing of the new loan (Docket No. 406 at pp. 13-14).  A month later, Rubí informed the bank that he could only contribute $2 Million.  Id. at 14.  A week later, he announced that he could not contribute any equity.  Id.  The board approved the Construction Loan without any equity contribution from Clema, Rubí or Levis.  Id.  Then it released Levis from her personal guarantees on all the Clema loans.  Id.

Federal Deposit Insurance Corporation v. Arrillaga-Torréns *et al.*
Civil No. 13-1328 (PAD)
Opinion and Order
Page 25

to no more than $5.25 Million instead of $6.22 Million (Docket No. 369 at p. 4; Docket No. 443 at p. 9),[7] and Marat recovery to no more than $7.05 Million rather than approximately $11.38 Million (Docket No. 443 at p. 12).[8]

The distinction between new loans and renewals along the terms that Arrillaga proposes to limit liability is not persuasive.  As the FDIC points out, the loans were underwritten, closed, and booked as new loans.  They were made to new entities (Marat), with new loan numbers (Marat, Acor), with new terms (Marat, Acor), with different guarantors (Marat), paid off other delinquent or overdrawn loans (Marat, Acor), gave new interest reserves to guarantee that the loan would be current for an additional time (Marat, Acor), gained origination commissions for the Bank (Marat), and paid off delinquent interest which was then booked as income for the bank (Marat, Acor) (Docket No. 406 at p. 7).  The relation between the original and subsequent transactions come together through novation.

The Puerto Rico Civil Code recognizes two types of novation: extinctive and modificatory. P.R. Laws Ann. tit. 31 §§ 3241, 3142; Web Service Group, Ltd v. Ramallo Bros. Printing, Inc., 336 F.Supp.2d 179, 182 (D.P.R. 2004); Nieves Domenech v. Dymax Corp., 952 F.Supp. 57, 63 (D.P.R. 1996).  An extinctive novation extinguishes the old obligation and creates a new one.  Web Service Group, 336 F.Supp.2d at 182.  In contrast, a modificatory novation amends, but does not extinguish, the original agreement.  Id.

---

[7] These would reflect (1) the $2 Million that the January 2007 renewal decision caused to be disbursed; (2) the $2.56 Million that the March 2008 decision caused to be disbursed; and (3) the $.69 Million that the January 2009 decision caused to be disbursed. Id. at p. 11.

[8] The figure results from assuming that the November 2008 and December 2008 loan approvals were a consolidation of the $6 Million and $2.15 Million loans funded before 2008, and a new loan for the disbursement of approximately $7,050,000.00 (Docket No. 443 at p. 12).

Extinctive novation may occur in one of two ways.  First, the parties may expressly state their intention to create a new agreement.  Nieves Dómenech, 952 F.Supp. at 62.  In those cases, extinction operates such that one contract is canceled and substituted by another, even if the only alteration in the prior contract involves a simple or slight modification of a secondary condition.  Francisco Garratón, Inc. v. Lenman & Kemp-Barclays & Co., Inc., 559 F.Supp. 405, 407 (D.P.R. 1983). Second, the parties may enter into a new agreement that is incompatible with the original one.  Nieves-Dómenech, 952 F.Supp. at 62.  Incompatibility exists when there are essential changes in the obligation, that is, an alteration in the principal conditions of the contract.  Miranda Soto v. Mena Ero, 109 D.P.R. 473, 479 (1980).

Modifications that are mainly quantitative in nature do not extinguish the original main obligation, which remains in effect with all its supplementary and accessory guarantees.  Francisco Garratón, 559 F.Supp. at 407.  For the same reason, extensions of the term to comply with an existing obligation are not considered incompatible with that obligation unless the term is considered a principal condition of the agreement.  Miranda Soto, 109 D.P.R. at 479-480.  Thus, rescheduling of debt the debtor is already obligated to pay does not generally carry extinctive effects.  Litheda Apartments, S.E. v. Amador, 2002 WL 32090201, *5 (P.R. Court of Appeals Dec. 18, 2002).

How these principles play out rests on the particular facts underlying the transactions.  See, Atocha Thom McAn, Inc. v. Registrador, 123 D.P.R. 571, 579-587 (1989)(holding that extensions of lease agreement in accordance with previously stipulated extension clauses did not create new obligations, but that subsequent renewal option based on a latter agreement configures a new obligation irrespective of whether the obligation incorporates some of the terms of the original agreement); García v. The Commonwealth Ins. Co., 118 D.P.R. 380, 383-384 (1987)(concluding

that surety is not obligated to make payment required by settlement agreement because, even though it had guaranteed payment in the event plaintiff prevailed in the lawsuit, the litigation settled, and the settlement in effect extinguished the prior obligation by novation, creating a new obligation subject to different terms and conditions).

On that basis, the court agrees with the FDIC that a jury may reasonably conclude that the loans were new loans. *Cf.* In re Matthews, 724 F.2d 798, 800 (9th Cir. 1984)(refinancing considered new loan: it paid off net balance due of old loan rather than extend its payments, converting delinquent loan into a current loan on lender's books with the effect of liberating original "purchase money" collateral)(collecting cases), *with* FDIC v. P.L.M. Intern., Inc., 834 F.2d 248, 251-252 (1st Cir. 1987)(substitution of debtor who assumed initial debtor's obligations did not extinguish those obligations even though the debtor was allowed to borrow additional money to carry out original projects on already encumbered real estate).

Still, directors may be liable for breach of fiduciary duties irrespective of whether they approve a new loan or a renewal. See, FDIC v. Mijalis, 15 F.3d 1314, 1324-1325 (5th Cir. 1994)(sustaining liability arising out of loan renewals).[9] If a "new" or "renewed" loan is taken to pay off an "old" loan, the money originally transferred to the borrower may be a bygone, but the amount to which it corresponds is not, for what remains of the old debt in effect becomes new debt. It does not become a sunk cost. The situation would be different if the proceeds of the latter transaction were used for a purpose other than to merge or subsume old debt into new debt to

---

[9] As the Court observed, "[w]e do not agree with the defendants' contention that our holding will make bank directors automatically responsible for 100% of the amount of any past credit transaction simply because they opt to renew, extend or restructure a problem loan. The law simply requires them to act with greater care than gross negligence when they do renew problem loans …" Mijalis, 15 F.3d at 1325. See also, FDIC v. Bober, 2002 WL 1929486, *3 (S.D. N.Y. Aug. 19, 2002)(holding that "bank directors may be liable for losses resulting from negligent renewals of the loans").

generate a new balance that has to be paid, in full.  So it is up to the jury to evaluate whether the Directors fulfilled their duty of care in approving the 2007, 2008, and 2009 transactions.

### 2.   Jocar Loan[10]

Jocar is a subsidiary of HIMA-San Pablo Group (Docket No. 367 at p. 8).  Nova Infusion & Compounding Pharmacy provided pharmaceutical services specializing in infusion therapies.  Id. at p. 6.  By 2004, it had outgrown its facilities, and borrowed $3.15 Million from Eurobank to purchase and build larger facilities.  Id. at p. 7.  In late 2005, it borrowed another $10.3 Million from Eurobank to purchase a larger facility and to consolidate prior loans.  Eurobank granted an additional $1.9 Million loan to fund construction of the new facilities, increasing Nova's total loan relationship with Eurobank to nearly $14 Million.  Id.

In mid-2007, Nova began experiencing cash-flow problems. It had agreements with major suppliers including Borschow Hospital & Medical Supplies and Baxter Pharmaceuticals, which required payment on 45-day credit terms.  Id. at p. 8.[11]  Nova paid those suppliers with receivables from major clients, including Triple S Salud, Blue Cross, Cigna, Humana, and Medicare.  However, they were on 60-day payment terms.  Id.  The 15-day lag between accounts payable and accounts receivable constricted Nova's cash flow, hampered its ability to timely pay its suppliers, and caused Nova to agree to disadvantageous financing terms.  Id.  The lag further impacted its

---

[10] Arrillaga takes issue with what he describes as "patently false" allegations by the FDIC regarding the Jocar Loan (Docket No. 367 at pp. 3, 12-19).  In this view, the false allegations amount to a Rule 11 violation (Docket No. 441 at p. 3), and justify a summary judgment dismissing the Jocar claim against him.  The court cannot say the record lacks evidence to support the allegations.  In context, they are not unfounded or misleading.  Nor will the court strike the affidavit of Mr. Richard George, which Arrillaga has characterized as "untimely," "conclusory" and of "zero evidentiary value." Id. at p. 5.  The same goes for the FDIC's request to strike the declaration of Cleofe Rubí.  The parties may present and question these witnesses in direct examination, and test them during cross examination at trial.

[11] The FDIC disputes that Nova paid its suppliers with receivables, and that the identified clients of Nova were on 60-day payment terms (Docket No. 398 at ¶ 6).

operating margin, shrinking it to 8%, largely because of an approximately $4 Million debt to Borschow.  Id.

In August 2007, Jocar purchased Nova's outstanding stock and shortly thereafter requested a $5 Million line of credit from Eurobank to get back on reasonable terms with suppliers.  Id. at pp. 8-9.  In exchange for the line of credit, the bank received a guaranty from HIMA securing the new line of credit and the pre-existing $14 Million in loans to Nova.  Id. at p. 9.  The loan made HIMA's earnings the primary repayment source.  Id. The $5 Million line of credit was executed in December 2007.  Id. at p. 10.  The FDIC alleges that Directors were grossly negligent in approving the line of credit (Docket No. 1 at ¶¶ 3, 56-61).  Arrillaga counters that there is absolutely no evidence supporting such allegation, and that summary judgment should be entered against the FDIC-R as to the Jocar loan.  He believes his decision is protected by the Business Judgment Rule (Docket No. 367 at p. 19).

The Business Judgment Rule creates a presumption that in making a business decision, directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.  It assumes that not all decisions by directors will result in benefit to the corporation or will, with the benefit of 20/20 hindsight, appear to be prudent. William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors*, 2-1 (8th Ed. 2010).  Plaintiff must overcome the presumption with competent proof predicated on the substantive elements of the claim.

The presumption does not call for an evidentiary framework different than the one used in other cases in Puerto Rico, where the defendant is presumed to have complied with the duty of care established by law so as to avoid liability unless plaintiff proves otherwise.  See, Arrieta v. De La Vega, 165 D.P.R. 538, 549 (2005)(noting that physicians are presumed to have exerted a

reasonable degree of care and provided patients with adequate treatment).  In the same way, the

Business Judgment Rule does not shield directors against grossly negligent conduct under P.R.

Laws Ann. tit. 14 § 3563.[12]  The FDIC must so establish by a preponderance of the evidence to

prevail as a matter of law.  See, Elías v. Chenet, 147 D.P.R. 507, 522 (1999)(holding that plaintiff

must show physician was grossly negligent to prevail under Law No. 139 of June 3, 1976, which

exempts from liability physicians that provide free treatment in the handling of an emergency so

long as they do not incur in, *inter alia*, gross negligence).[13]

Arrillaga claims he voted to approve the line of credit so that Nova could unlock the cash-

flow problems it was having with suppliers, which in turn, would improve the company's profit

margins and enable it to repay the debt.  He maintains the alternative was to declare the loan in

default and institute costly and time-consuming legal measures.  Thus, he made a good faith,

rational decision based on a legitimate business purpose (Docket No. 441 at p. 3).

When the loan was approved, Nova owed Eurobank $14 Million (Docket No. 397 at p. 2).

At the time, the bank did not have current financial statements from either Nova or Jocar.  Id. at

pp. 2-3.  The current financial statements of HIMA, the guarantor whose earnings were identified

as the primary source of repayment, showed that HIMA's working capital was negative $34

---

[12] As used in Puerto Rico, gross negligence consists of complete lack of care or so small a degree of diligence that justifies the belief that the defendant acted with complete indifference for the interest and welfare of the other party.  Chenet, 147 D.P.R. at 522 (citing Pueblo v. Telmaín Escalera, 45 D.P.R. 447 (1933), pursuant to which gross negligence is characterized by a high degree of negligence, such as exists whenever danger is high and care too little or none).  It does not include mere errors in judgment.  Rivera Sanfeliz, 193 D.P.R. at 53, n.13.

[13] Various affirmative defenses suggest that directors may not be found liable unless they have acted with bad faith, intentional disregard of the law, or criminal intent outside the scope of their authority (*i.e.* Docket No. 45, Defenses 7, 25, 26; Docket No. 48, Defenses 13, 19; Docket No. 200, Defense 26).  The test is "gross negligence" rather than some other measure of breach, and does not require that a director act outside the scope of her authority in order to be liable.  In these circumstances, the defenses in question fail as a matter of law.  In Docket No. 364 at pp. 22-25, the FDIC requests a similar ruling as to affirmative defenses asserting various degrees of prudence, honesty, and diligence (*i.e.* Docket No. 45, Defenses 8, 9, 10, 15; Docket No. 48, Defenses 10, 11, 20, 21, 22, 27; Docket No. 200, Defenses 8, 9, 10, 15).  That request is DENIED, for those defenses lay the foundation for defendants to factually challenge the FDIC's assertion of gross negligence by presenting a competing version of events.  Given the record, whether they succeed will be determined at trial.  For the same reason, the FDIC's motion at Docket No. 54 to strike defenses must be DENIED AS MOOT.

Million, and that out of $50 Million in available lines of credit, $46 Million was outstanding.  Id. at pp. 2-3.  Its net earnings for 2007 were projected to decrease by 21.6% compared to 2006.  Id. at p. 3.

HIMA may have been subjected to a Loan and Security Agreement with another lender (Westernbank).  Id. at pp. 3, 9-10, 13.  If so, that lender had a superior lien position on the same collateral.  Id.  The bank did not seem to have performed any preliminary audit of collateral assets, and nothing would appear to confirm that the loan was being advanced against actual and verifiable receivables and inventory of the borrower on an ongoing basis.  Id. at pp. 4-5.

The FDIC argues that the factual setting permits a reasonable jury to find that Arrillaga was grossly negligent in approving the line of credit.  Id. at p. 17.  In this way, it asserts that Arrillaga approved the $5 Million loan to a borrower (Jocar), whose financial statements were not analyzed, to be used on a subsidiary (Nova) that was on the brink of bankruptcy, on the strength of a guarantor (HIMA) that was both financially and contractually incapable of paying the debt (Docket No. 397 at p. 11).

Arrillaga responds with alternate explanations revolving around the sufficiency of financial statements; working capital and what it should have lead Arrillaga to conclude; credit lines and their relationship to credit risk; net and projected earnings; HIMA's position in the medical industry, absence of indebtedness to another lender, and ability to back up the transaction (Docket No. 441 at pp. 6-12).  The FDIC challenges Arrillaga's explanations, pointing out, among other things, that the latest financial information on HIMA showed minimal capacity to service the debt (Docket No. 486 at pp. 6-8).[14]  Resolving a claim such as gross negligence involving fluid concepts

---

[14] For example, Arrillaga contends that some of HIMA's subsidiaries made pledges to Westernbank, but that HIMA, the entity responsible for guaranteeing the loan here, did not (Docket No. 441 at p. 4).  He adds that HIMA could not have been a party to the Westernbank Agreement because the Agreement was made in March 2005, and HIMA was incorporated in December 2005.

like reasonableness and foreseeability in a setting like the one here is for the factfinder. <u>See</u>,

<u>Candelario Del Moral</u> v. <u>UBS Financial Services of Puerto Rico</u>, 699 F.3d 93, 100 (1st Cir.

2012)(noting that summary judgment is "an improper vehicle for resolving questions of this sort");

<u>Elías</u>, 147 D.P.R. at 522 (reversing trial court for having dismissed through summary judgment

gross negligence claim against physician under Law No. 139). On that basis, the evidence must

be tested at trial.

### C.  FDIC's Role

Arrillaga alleges the FDIC is responsible for the losses it seeks to recover. He asserts the

FDIC destroyed Eurobank as part of a project –Project Thamis– to downsize Puerto Rico's banking

industry, which on this account, the FDIC had decided was "overbranched" and "overbloated"

(Docket No. 419 at p. 3). He posits that like other Puerto Rico banks, Eurobank had reacted to the

loss of commercial deposits resulting from a ten-year phase-out of depositor tax incentives after

1996, by taking on brokered deposits, and that by 2008, the Bank had attracted over a billion

dollars in brokered deposits that it used for typical lending activities, funding community projects

on the Island that on his account, fostered economic growth and provided jobs. <u>Id.</u>[15] But, he

---

<u>Id.</u> at p. 13. The FDIC-R counters that when Eurobank failed, Oriental Bank purchased its loans, began the process of trying to collect them, and discovered that HIMA's guarantee was worthless. To this end, it found out that each and every one of HIMA's assets were pledged to Banco Popular (Westernbank's successor), all of HIMA's cashflow is controlled by Banco Popular, and that Banco Popular has been very strong in its position that HIMA is not authorized to make payments not approved by Banco Popular, and cannot use the guaranteed assets to pay for non-operational debt payments. HIMA's debt with Banco Popular has been estimated at close to $380 Million (Docket No. 397 at p. 10). Arrillaga responds that if Oriental failed to enforce the "unlimited corporate guarantee" of HIMA because "it erroneously believed that HIMA was subject to the Westernbank Agreement, then that constitutes a failure to mitigate" (Docket No. 441 at p. 14). In turn, the FDIC-R asserts that it never said HIMA was an original party to the March 2005, Agreement, but that in HIMA's 2006 financial statements HIMA itself discloses that at least by that point, it was subject to the terms of that Agreement (Docket No. 486 at p. 7), and that "[a]ll that matters at this juncture is that there is undisputed summary judgment evidence that as of December 31, 2006 (months before the loan to Jocar was approved), HIMA was subject to the terms of a credit agreement that fully encumbered its assets and prohibited it from guaranteeing the debts of other borrowers." <u>Id.</u> at pp. 7-8. On the same point, it states that "despite the disclosures in HIMA's financial statements that either revealed or provided a roadmap to this evidence, Arrillaga apparently did nothing to explore the issue. . .". <u>Id.</u> at p. 9.

[15] The tax incentives appear to be related to Section 936 of the U.S. Internal Revenue Code (Docket No. 420, Exh. 7). Section 936 permitted U.S. corporations to offset the United States tax on their possessions income with a tax credit. Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 1051, 90 Stat. 1643. Congress terminated the Section 936 credit effective for all tax years after December

asserts, the FDIC drew up a plan to "rightsize" Puerto Rico's banking industry (which meant shrinking it to a size the FDIC thought the Island deserved), featuring the elimination of Eurobank and two other banks.  Id. at 3-4.  He expresses the FDIC stripped the Bank of liquidity by forcing it to use up valuable cash to shrink its brokered deposit base, which predictably forced the Bank into a liquidity crisis (Docket No. 485 at p. 8).

Arrillaga avers that but for the FDIC's manipulation of Puerto Rico's banking industry, there would have been (1) no Project Thamis; (2) no coordinated takeover of Puerto Rico banks by the FDIC; and (3) no $647 million payout by the FDIC from the Deposit Insurance Fund, and no losses (Docket No. 485 at p. 6).[16] Along the same line, he claims the FDIC breached its duty to protect depositors and the Deposit Insurance Fund because it "turned what could have been a zero-cost resolution into a $647 million mess, for the purpose of satisfying Project Thamis' express goal of drastically reducing brokered deposits in Puerto Rico banks" (Docket No. 419 at p. 14).  He argues that from this wealth of evidence, reasonable jurors could conclude that the FDIC caused some or all of its alleged damages.  And for the same reason, given that Puerto Rico is a comparative-fault jurisdiction, he states that defendants are entitled to apportion fault as to all parties contributing to the damage including the FDIC, which in this view, breached a duty to mitigate alleged losses to itself, to depositors, and the Deposit Insurance Fund (Docket No. 419 at pp. 6, 14; Docket No. 485 at pp. 15-16).[17]  The FDIC counters this case is about loans, not about who is responsible for the bank's insolvency and closure (Docket No. 455).

---

31, 1995, with a limited ten-year phase out period ending on December 31, 2005.  29 U.S.C. § 936, Small Business Job Protection Act of 1996, Pub. L. No. 104-188, Sec. 1601(a), 110 Stat. 1827.

[16] E.g. the amount, which according to the Complaint, the FDIC paid out as a result of Eurobank's closing (Docket No. 1, Preliminary Statement).

[17] In general, "broker deposits" are deposits obtained directly or indirectly from or through the mediation or assistance of a deposit broker.  See, 12 C.F.R. § 337.6(a)(2)(so stating).  A deposit broker is some who is "engaged in the business of placing deposits or

### a.   Comparative Negligence and Mitigation of Damages

It is true that Puerto Rico is a comparative negligence jurisdiction.  See, Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 37 (1st Cir. 2011)(so recognizing); Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 87 (1st Cir. 1998)(same).  The comparative negligence standard was adopted in 1956 to replace the common-law doctrine of contributory negligence. Candelario Del Moral v. UBS, 2016 WL 1275038, *25 (D.P.R. March 31, 2016); Carlos J. Irizarry Yunque, *Responsabilidad Civil Extracontractual*, 259 (7th ed. 2009).  It abolishes doctrines that give all-or-nothing effect to certain types of plaintiff's negligence to adjust recovery.  Candelario Del Moral, 2016 WL 1275038 at *25.

Hence, the amount of damages otherwise recoverable is diminished, in the proportion which culpable conduct attributable to the claimant bears to the culpable conduct which caused

---

facilitating the placement of deposits of third parties with the insured depository institutions" 12 U.S.C. § 1831f(g)(1)(A).  The definition includes those in the business of "placing deposits with insured depository institutions for the purpose of selling interests in those deposits to third parties," id., and "an agent or trustee who establishes a deposit account to facilitate a business arrangement with an insured depository institution to use the proceeds of the account to fund a prearranged loan." Id. at § 1831f(g)(1)(B).  There are a number of exclusions from the "deposit broker" definition.  Id. at § 1831f(g)(2).  According to Arrillaga, brokered deposits are usually located outside of Puerto Rico as opposed to retail deposits, which are deposits made by individuals living in Puerto Rico (Docket No. 419 at p. 3 and n.2).  In the mid-1980's federal banking regulators expressed concern over the growing practice of obtaining large deposits through the services of money brokers.  Those concerns were related to the cost to the institutions of obtaining such deposits, the possibility of favored treatment in extending loans to those serving as money brokers in placing the deposits, and the destabilizing influence that large amounts of deposits on these terms might have on weak financial institutions, who might turn to brokered funds to shore up shaking financial conditions.  Likewise, regulators believed that the practice of money brokers' placing deposits in this manner could be deleterious to the deposit insurance system, and that if federal deposit insurance covered funds so deposited, the individual investors would be protected from risks even though such funds might have been placed in otherwise financially weak institutions, under terms that may have contributed to the institutions' weakness.  See, Schroeder, *The Law and Regulation of Financial Institutions*, 11-36 (A.S. Pratt & Sons Group, 2012 update).  In 1989, Congress acted to limit, but did not prohibit brokered deposits, tightening the restrictions in 1991.  Under the present state of the law, an insured depository institution that is not well capitalized is prohibited from accepting funds directly or indirectly through a deposit broker. 12 U.S.C. § 1831f(a).  The FDIC may permit an insured depository institution that is not well capitalized to accept brokered deposits on a case-by-case basis, on application from the institution, but the FDIC may do so only if the institution is adequately capitalized.  Id. at § 1831f(c).  To grant such a waiver, the FDIC must make a specific finding that acceptance of the brokered deposits does not constitute an unsafe or unsound practice with respect to such institution.  Id.  In this connection, see Frontier State Bank Oklahoma City, Okla. v. FDIC, 702 F.3d 588, 602-603 (10th Cir. 2012), where the Court rejected a bank's challenge to the FDIC's finding that the bank's liquidity was impaired by, *inter alia*, use of brokered deposits, pointing out that the FDIC has noted a correlation between the heavy use of brokered deposits and collapse of financial institutions.  Id. at 602 n.15.  Clifford S. Stafford & Colin C. Richard, *FDIC Updates Brokered Deposits Resources*, 133 Banking L. J. 98 (2016); Paul T. Clark, *Just Passing Through: A History and Critical Analysis of FDIC Insurance of Deposits held by Brokers and other Custodians*, 32 Rev. Banking & Fin. L. 99 (2012); and Gail Otsuka Ayabe, *The Brokered Deposit Regulation: A Response to the FDIC's and FHLBB's Efforts to Limit Deposit Insurance*, 33 UCLA L. Rev. 594 (1985), discuss various aspects of this issue.

the damages.  If a plaintiff's own conduct is one of the adequate causes of his harm, his award is reduced in proportion to the percentage of the harm that he caused.  Baerga v. Autoridad de Energía Eléctrica, 2001 WL 1763251, *9 (P.R. Court of Appeals Nov. 28, 2001); Herminio M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 414 (2d ed. 1986).  As an award-adjustment mechanism, comparative negligence is related to mitigation.

The mitigation doctrine requires the injured party to take advantage of reasonable opportunities to minimize damages after these occur.  Gener-Villar v. Adcom Group, Inc., 560 F.Supp.2d 112, 133-134 (D.P.R. 2008).  An injured party with an otherwise valid cause of action who fails to mitigate her damages may not recover damages shown to have resulted from her failure to use reasonable efforts to mitigate the loss.  Id. at 134.  Defendants bear the burden of proving that the injured party was negligent or failed to take reasonable steps to hold down her loss.  Id. at 135.

### b.  *Tortfeasors*

Every tortfeasor is ultimately responsible solely for its proportionate allotment of the total damages.  Zurich American v. Lord Electric Co. of Puerto Rico, 828 F.Supp.2d 462, 471 (D.P.R. 2011).  To the extent the defendant tortfeasor proves another tortfeasor's proportionate share of the overall damages, her contribution is reduced accordingly.  Those calculation may be made even when that tortfeasor is immune from liability and the immunity is established prior to the incident that has produced the injury.  Id.

The FDIC contends that apportionment would be improper because even though the Directors blame the FDIC for destroying the bank, such would be the FDIC Corporate, which is not a party to this case (Docket No. 455 at p. 4).  On that basis, it states the Directors may not bring in evidence of the FDIC Corporate's alleged wrongdoing.  Id. at pp. 14, 16-17.  The FDIC's status

as a party plaintiff should not be confused with its potential status as a causative factor in the losses which it claims, for it acts in "multiple capacities." See, FDIC v. Ernst & Young, LLC, 374 F.3d 579, 581 (7th Cir. 2004)(noting FDIC's multiple capacities); FDIC v. Rahn, 116 F.3d 1142, 1145 (6th Cir. 1997)(pointing out that the FDIC functions in different guises). For present purposes, it is useful to treat it as two entities: the FDIC-Corporate ("FDIC-C") and the FDIC-Receiver ("FDIC-R"). See, FDIC v. Roldán-Fonseca, 795 F.2d 1102, 1109 (1st Cir. 1986)(recognizing dichotomy of FDIC-C and FDIC-R). Their institutional roles affect the focus of Arrillaga's argument and of this litigation.

### c. *Genesis/Functions*

The FDIC was established in 1933 in response to an epidemic of bank closures during the Great Depression, to restore confidence in the Nation's banking system by creating a system of deposit insurance. See, Banking Act of 1933, 48 Stat 163. Subsequent legislation expanded and refined the FDIC's role in this area. See e.g. FDIC Act of 1950, 64 Stat. 873; Financial Institutions Supervisory Act of 1966 ("FISA"), Pub. L. No. 89-695, 80 Stat. 1028; FIRREA in 1989; Federal Deposit Insurance Corporation Improvement Act of 1991("FDICIA"), Pub. L. 102-242, 105 Stat. 2236; Federal Deposit Insurance Reform Act of 2005, Pub. L. No. 109-171, Title II, Subtitle B ("FDIRA"); and the Financial Services Regulatory Relief Act of 2006 ("FSRRA"), Pub. L. 109-351 (2006).[18]

---

[18] Among other things, FISA granted federal supervisory agencies the power to issue cease and desist orders; and FIRREA expanded, enhanced, and clarified enforcement powers of federal financial-institution regulatory agencies, granting increased authority to regulators to impose civil penalties and easing banking agencies' standards for issuing temporary cease and desist orders, and gave the FDIC authority to act as receiver or conservator for failed institutions. In turn, FDICIA requires federal banking agencies to set new standards for safety and soundness in certain areas, increases federal oversight of federally-insured banks, and enlarges the circumstances under which a conservator or receiver may be appointed for any insured depository institution; whereas FDIRA revises the manner in which the FDIC determines the amounts to assess institutions for deposit insurance, changing the rules under which the FDIC sets the amount of reserves it maintains, provides new rules for determining refunds, dividends and credits for insurance assessments paid by depository institutions; and gives the FDIC power to adjust by inflation the amount of deposit insurance payable to depositors. FSRRA clarifies the discretionary authority of federal banking agencies to enforce conditions on the terms of agreements with depository institutions and institution affiliated parties. Milton R.

As part of its responsibilities, the FDIC acts as an insurer, overseer and regulator; and as conservator or receiver of troubled and insolvent financial institutions.  FDIC v. Eckert Seamans Cherin & Mellott, 754 F.Supp. 22, 24 (E.D.N.Y. 1990); Ernst & Young, 374 F.3d at 581; Schroeder, supra, at p. 12-1.  It insures deposits of banks and savings associations; supervises the liquidation of insolvent depository institutions that it has insured; acts as conservator and receiver of insured depository institutions; provides assistance, when appropriate, to rehabilitate weak depository institution and to arrange measures to forestall depository institution failures and depository losses, including correcting action when an insured institution is critically undercapitalized; and, exercises general supervisory authority over the state banks that it insures but that are not members of the Federal Reserve System  See, Schroeder, supra at pp. 11-2.[19]  Given such a spectrum of responsibilities, no breach of any duty of care can be attributed to the FDIC-C to support Arrillaga's particular claim of FDIC malfeasance.

### d.  O'Melveny

Prior to 1994, there was an emerging consensus that affirmative defenses alleging (for instance), negligence or failure to mitigate damages, could not be raised against the FDIC.  The consensus emerged from what was called the "no duty rule," because as one court explained, the rule rested on the understanding that the FDIC's purpose is to promote the stability of the banking system and to protect depositors, the insurance fund, and the public, and therefore, owes no duty

---

Schroeder, supra at §§ 1.02[4], 1.02[6], 7.01[1], 10.01[2], 10.01[3], 11.01, 12.01[2], provides a valuable overview of these developments.

[19] In this capacity, the FDIC has the power to conduct bank examinations, to regulate the establishment of branches, as well as the power to exercise other regulatory control, in a manner similar to the powers exercised by the other federal banking agencies over the institutions under their supervision.  Further, it has general back-up enforcement authority over all insured depository institutions to protect their safety and soundness and to enforce compliance with banking laws and regulations.

to the directors and officers of a failed financial institution.  See, FDIC v. Haines, 3 F.Supp.2d

155, 159-160 (D. Conn. 1997)(so explaining).[20]

The rule was applied to insulate the FDIC from claims and defenses arising out of its

conduct both as regulator and as receiver of failed institutions.  Id. at 160 (describing how rule

applied).  See also, FDIC v. Baker, 739 F.Supp. 1401, 1407 (C.D. Cal. 1990(stating that "no duty

devolves onto the FDIC in favor of officers and directors of a failed banking institution when the

FDIC's role is either regulator or receiver of that institution"). For the same reason, if an

affirmative defense included an element of duty owed by the FDIC or challenged a discretionary

act of the FDIC, it was considered insufficient as a matter of law.  Haines, 3 F.Supp.2d at 160.

The Supreme Court called that consensus into question with its decision in O'Melveny,

512 U.S. at 79.  In that case, the FDIC, acting in its capacity as receiver for a failed bank, sued a

third-party law firm that performed services for the bank, claiming the firm had been negligent

and breached its fiduciary duty by failing to uncover the wrongdoing of certain officers of the

bank.  Id. at 81-82.  The district court entered summary judgment in favor of the law firm,

apparently on the ground that under California law, knowledge of the employee's misconduct is

imputed to the employer – and thence to the FDIC as receiver in the employer's stead.  Id.  The

Ninth Circuit held that federal common law governed whether the knowledge of bank officers

acting against the bank's interest would be imputed to the bank, and whether such knowledge

could be used as the basis of an estoppel defense against the FDIC as receiver.  Id. at 83.

The Supreme Court reversed, holding that, with rare exceptions, there is no federal general

common law.  Noting that FIRREA contains specific provisions that create federal rules of

---

[20]  Breach of duty of care is a condition precedent for a finding of negligence.  See, W. Prosser & P. Keeton, *Prosser & Keeton on Torts*, § 30 (5th ed. 1984)("When there is no legal duty, there can be no breach of duty and, therefore, no finding of negligence"); Brau Del Toro, supra at p. 180-181 (a finding of negligence requires a duty of care and breach of such duty).

decision regarding claims by, and defenses against the FDIC as receiver, the Court adhered to the principle of "*inclusio unius, exclsio alterius*," the inclusion of one is the exclusion of another.  Id. Thus, it explained that except as otherwise delineated in FIRREA, state law governs the FDIC's rights and liabilities as a receiver.  Id. at 88.

Following O'Melveny, a number of courts have concluded the no-duty rule did not insulate the FDIC as receiver from affirmative defenses otherwise available under state law.  See, FDIC v. Skow, 741 F.3d 1342, 1347 (11th Cir. 2013)(rejecting no-duty rule as impediment to affirmative defenses based on FDIC's role as receiver); FDIC v. Gladstone, 44 F.Supp.2d 81, 85-88 (D.Mass. 1999)(same);  Resolution Trust Corp. v. Liebert, 871 F.Supp. 370, 371-373 (C.D. Cal. 1994)(same).

Various courts, however, reached the opposite conclusion, distinguishing cases in which the FDIC's own conduct is at issue from the facts of O'Melveny, which involved the conduct of a third party.  See, e.g. FDIC v. Healey, 991 F.Supp. 53, 61 (D.Conn. 1998).  To that end, some courts expressed concern about the potential for conflict between federal interests and state affirmative defenses permitting or requiring judicial scrutiny of the FDIC's discretionary decisions, which in their view should not occur.  Id.  Other courts mentioned the FDIC should not be in a better or worse position that the failed bank would have been if the bank had brought suit itself.  On that basis, they reasoned that when the FDIC brings suit as a receiver of a failed bank, it takes it subject only to those affirmative defenses that would have been available to the defendants against the bank if the bank had brought suit, and those defenses do not include defenses asserted against the FDIC.  See, Resolution Trust Corporation v. Massachusetts Life Ins. Co., 93 F.Supp.2d 300, 304-305 (W.D.N.Y. 2000)(so noting).  Even more, see, FDIC v. Collins,

920 F.Supp. 30, 35 (D. Conn. 1996)(stating that courts should focus on the alleged wrongdoers' actions, not the actions taken by the FDIC).

The First Circuit has not evaluated this problem.  But in the court's view, the Skow and Gladstone line of cases have the better view in this debate.  From O'Melveny, it is apparent that the FDIC in its receivership capacity is subject to state law affirmative defenses except when FIRREA provides otherwise.  And FIRREA does not impose a "no duty" rule on the receiver.  See, Skow, 741 F.3d at 1347 ("That FIRREA is silent on this issue is undisputed").  In consequence, the court is persuaded that the FDIC as receiver is subject to defenses based on state law.  See, Grant Thornton v. FDIC, 435 Fed.Appx. 188, 199 (4th Cir. 2011(stating that state law controls what defenses are available against the FDIC when the agency is acting as receiver of a failed financial institution); FDIC v. Ornstein, 73 F.Supp.2d 282, 284 (E.D.N.Y. 1999)(same).

### e.  FTCA

The FDIC argues that allowing Arrillaga's defenses amount to a challenge of discretionary functions in violation of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (Docket No. 364 at pp. 2, 11).  The FTCA waives sovereign immunity for the negligent or wrongful acts of Government employees.  United States v. Gaulbert, 499 U.S. 315, 318, n.4 (1991).  Sovereign immunity means that the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction.  United States v. Mitchell, 463 U.S. 206, 212 (1983).

The FTCA is subject to several exceptions.  See, 28 U.S.C. § 2680.  One of these exceptions, the discretionary function exception, protects federal agencies from "[a]ny claim based upon . . .  performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency. . . ". 28 U.S.C. § 2680(a).  In essence, the exception presumes that an agency's acts are grounded in governmental policy when a statute, regulation or agency guideline

allows the agency to exercise discretion.  Gaubert, 499 U.S. at 324.  Its purpose is to "prevent

judicial 'second-guessing' of legislative and administrative decisions … through the medium of

an action in tort."  Id. at 323 (internal citations omitted)

Given that the discretionary function exception applies to "any claim" and does not include

the term "defense" or "affirmative defense," when applied it is as a defense against suit.  It is not

a defense against affirmative defenses.  Thus, the discretionary function exception would only bar

a cause of action against the FDIC as receiver.  It would not protect the FDIC-R as plaintiff from

a defendant's affirmative defenses based on state law arising out of the FDIC-R's post-

appointment conduct.  See, Gladstone, 44 F.Supp.2d at 88 and cases cited therein.

### f.  Setoff

The FDIC claims that allowing defenses would amount to an improper setoff barred by

FIRREA's priority distribution scheme (Docket No. 364 at pp. 21-22; Docket No. 455 at p. 17).

It argues that the order of priority for payment of claims against a failed institution in receivership

is set forth in 12 U.S.C. § 1821(d)(11)(A); payments on claims within each priority class are made

on a *pro rata* basis; unless there are sufficient receivership assets to pay deposit liabilities in full,

Congress has prohibited the receiver from making any distribution on claims to general creditors;

and the FDIC has formally determined that the assets of Eurobank are insufficient to make any

distribution on claims of general unsecured creditors of the bank (Docket No. 364 at p. 20).

Arrillaga counters his defenses seek to apportion fault, which does not establish liability, let alone

a right to payment, priority or otherwise (Docket No. 419 at p. 33).

Apportionment is not a synonym for compensation or setoff.  Compensation takes place

when two persons, in their own right, are mutually creditors and debtors of each other. Article

1149 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 3221; Toro v. Colón, 176 D.P.R.

528, 540-541 (2009); García Méndez v. Vázquez Bruno, 440 F.Supp. 985, 988-989 (D.P.R. 1977).

To operate: (1) each of the persons bound should be so principally, and be at the same time, the

principal creditor of the other; (2) both debts shall consist of a sum of money, or, when the things

due are perishable, they must be of the same kind and also of the same quality, if the latter should

have been stipulated; and (3) both debts must be due, determined and demandable, and none of

them be subject to any retention or suit instituted by a third person, and of which due notice has

been given the debtor.  Article 1150 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 3222;

Toro, 176 D.P.R. at 541-542.  Its effect is to extinguish both debts to the concurrent amount, even

when the creditors and debtors have no knowledge thereof. Article 1156 of the Puerto Rico Civil

Code, P.R. Laws Ann. tit. 31 § 3228.

The record is insufficient to demonstrate operation of the defining features of Article 1149.

There is no discernible basis to conclude that the FDIC and the Directors are both creditors and

debtors of each other, or that there are mutual or reciprocal debts due, determined and demandable

by any of the parties.  Relying on Ramos v. Caparra Dairy, Inc., 116 D.P.R. 60 (1986), however,

the FDIC states that apportionment of fault between two joint tortfeasors when one such tortfeasor

is immune so as to reduce the amount of damages is a form of compensation, "the Puerto Rico

equivalent of set off," and that it would be improper given the insufficiency of assets to pay off

unsecured creditor claims under FIRREA (Docket No. 455 at pp. 17-18).

To the extent compensation may be found in a case of apportionment of fault between joint

tortfeasors when one tortfeasor is immune, the court might agree with the FDIC.  But as Ramos

shows, that is not sufficient to trigger a setoff or compensation, and is not the only way leading up

to it.  In Ramos, the trial court concluded that the defendant and a coplaintiff were joint tortfeasors,

70% and 30% respectively, responsible for the deceased's death.  The coplaintiff was the

deceased's mother, and as such, immune in Puerto Rico from liability resulting from the incident causing the loss. The defendant deposited in court 100% of the payment corresponding to the damages awarded, except the portion reflecting the mother's negligence. The trial court held that it was improper to limit payment as to the mother's negligence because, among other things, no counterclaim had been filed against her.

The Puerto Rico Supreme Court reversed, holding that once a joint tortfeasor pays more than its proportional share of liability, it becomes a creditor entitled to offset the excess payment from the remaining tortfeasors. So setoff comes into existence after the percentages of negligence have been established, and the tortfeasor pays in excess of what its percentage of negligence calls for. Before that point, there is no credit to offset anything from. No apportionment of liability has been made here, and no one has paid anything, much less an amount in excess of a proportional share of liability. Hence, the court does not read Arrillaga's reference to apportionment of negligence as a request to pay and cancel off a debit payable to the FDIC with a credit held against the FDIC in violation of the FIRREA distribution-priority scheme.[21]

---

[21] Almeida León v. RG Premier Bank, Civ. No.10-2209 (JAG) is not inapposite. In that case, the court dismissed plaintiffs' federal claim with prejudice, declining to exercise jurisdiction over supplemental state claims. The FDIC asked for reconsideration so that it be dismissed for lack of federal subject matter jurisdiction (Docket No. 107). Plaintiffs said that the FDIC had obtained judgments against them in other cases, one of which was a default judgment in excess of $2.8 Million, and that any judgment for plaintiffs in the case could give a rise to a right to setoff under the Bankruptcy Code as to adverse judgments against them in the other cases. The court noted that to allow plaintiffs to retain even "a potential right to setoff" against the FDIC would permit them to jump the line in front of higher priority creditors in violation of FIRREA. It then dismissed the state claims against the FDIC without prejudice, for lack of subject matter jurisdiction. By contrast, no judgment has been entered against Arrillaga or the other directors allocating or apportioning negligence in any sense, to be asserted against judgments expected to be entered in other proceedings or vice versa. In the same way, the situation *sub judice* is different than the one evaluated in FDIC v. RPM Mortg., 2010 WL 9502044 (C.D. California Aug. 13, 2010), where the court rejected a counterclaimant's attempt to recoup or offset the recovery it was expecting against any recovery that the FDIC could obtain. Arrillaga did not, however, file a counterclaim against the FDIC-R. Similarly, see Placida Professional Center v. FDIC, 512 Fed.Appx. 938, 951(11th Cir. 2013)(denying request to offset repudiation damages arising out of FDIC's repudiation of contract against monies owed to FDIC, because it would exceed the *pro rata* share permitted by FIRREA). Yet Arrillaga is not seeking damages. See also, Bank of America, NA v. FDIC, 962 F.Supp.2d 165, 173 (D.D.C. 2013), in which the court held that the counterclaimant may not offset the value of recovery on claims it has, against any recovery that the FDIC might make. At the end of the day, compensation requires credit(s) and debit(s) corresponding to two different persons or entities, simultaneously standing as principal creditor(s) and debtor(s) of each other. See, United Structures of America, Inc. v. G.R.G. Engineering, S.E., 9 F.3d 996, 1000 (1st Cir. 1993)(recognizing that compensation is primarily a devise allowing the convenient simplification of relations between mutually indebted parties). Based on Arrillaga's representations, he does not expect to recover anything that might be available to be compensated or offset against anything else.

### g.  Dividing Line

As to the FDIC's pre-receivership role, the majority of courts have held that pre-closure conduct of federal banking regulators cannot be attacked by directors sued for breach of fiduciary duties.  See, Resolution Trust Corp. v. Sands, 863 F.Supp. 365, 372-373 (N.D. Tex. 1994) (directors cannot attack the pre-conservatorship conduct of federal banking regulators).[22]  The main reasoning behind this position is that the regulatory agencies' purpose is to stabilize the banking industry and promote public confidence in the banks and, therefore, that their duty is to the general public, not individual banks, directors or officers.  Resolution Trust Corp. v. Greenwood, 798 F.Supp. 1391, 1397 (D. Minn. 1992).[23]

Arrillaga contends the FDIC-R is suing here on behalf of, or for the benefit of the FDIC-C, from whom it received the claims on assignment to capitalize the insurance fund (Docket No. 419 at p. 14; Docket No. 485 at p. 13).  That being so, he argues, the FDIC-R is subject to all defenses to which the assignor would be subject, including the FDIC-C's breach of duty to protect the deposit insurance fund.  Id.

A general principle of assignment provides that the assignee steps into the shoes of the assignor upon assignment of the interest, taking the assignment subject to the defenses assertable

---

[22] See also, Resolution Trust Corp. v. Farmer, 823 F.Supp. 302, 310 (E.D. Pa. 1993)("…[A]s a matter of law regulatory conduct cannot stand as a basis for direct claims, affirmative defenses and counterclaims against federal banking regulators"); FDIC v. Lowe, 809 F.Supp. 856, 857-858 (D. Utah 1992)("It is well settled that affirmative defenses asserted against the FDIC in its capacity as a regulator of banking activities are insufficient as a matter of law"); Resolution Trust Corp. v. Youngblood, 807 F.Supp. 765, 771 n.20 (N. D. Ga. 1992)("…[T]he RTC owes no duty to officers and directors arising out of regulatory activity")(internal citations omitted); FDIC v. Carter, 701 F.Supp. 739, 737-738 (C.D. Cal. 1987)(concluding that pre-receivership activities of the FDIC cannot form basis of counterclaims or affirmative defenses); Ornstein, 73 F.Supp.2d at 281 (striking affirmative defenses to the extent they relied on pre-receivership conduct by federal regulators).

[23] Other rationales leading to the same result include sovereign immunity and discretionary action.  Lowe, 809 F.Supp. at 858.  As for the FTCA and the discretionary function aspect of the equation, the FDIC is not being sued here; the directors are.  Nevertheless, it was the FDIC-R who initiated the litigation, not the FDIC-C.  Whether utilizing an analysis based upon lack of duty or sovereign immunity and discretionary action or both, at bottom courts have rejected directors' attempts to assert or limit liability predicated on actions undertaken by banking regulators acting as such.  Id.  The court is not persuaded to adopt a different view.

against the assignor.  Wella Corporation v. Banco Comercial, 114 D.P.R. 216, 219-220 (1983).

But there is no evidence of assignment from FDIC-C to FDIC-R.  FIRREA authorizes the FDIC

as receiver to sue directors.  12 U.S.C. § 1821 (k).  Further, the FDIC-R "steps into the shoes" of

the failed institution, taking over to assert, in its own right, the rights of the insured depository

institution that existed prior to receivership.  O'Melveny, 512 U.S. at 86.  In that sense, any defense

the directors themselves may have against the original party – the bank – may be good against the

receiver.  Id.  But Arrillaga's attack is not geared toward the bank but at the FDIC, and it cannot

serve to question the decisions the FDIC made in its pre-receivership role as Eurobank's insurer

or regulator.   See, Credit Life Insurance Co. v. FDIC, 870 F.Supp. 417, 421 (D.N.H.

1993)(pointing out that FDIC-C cannot be held responsible for the failed bank's receiver's

actions).[24]

Courts have maintained a wall between the FDIC's two functions, holding the actions of

the FDIC as a regulator cannot form the basis for claims asserted against the FDIC as a receiver,

and vice-versa.  See, FDIC v. White, 828 F.Supp. 304, 308 (D.N.J. 1993)(so noting); FDIC v.

Eckert Seamans Cherin & Mellott, 754 F.Supp. 22, 25 (E.D. N.Y. 1990)(holding that, "the

assertion of any claim based on FDIC's conduct in its corporate capacity may not be asserted

against FDIC as receiver of the bank").  So they have not permitted defenses available against the

FDIC in one capacity to be raised in a case brought by the FDIC in another capacity.  See, Federal

Sav. and Loan Ins. Corp. v. Burdette, 696 F.Supp. 1183, 1188 (E.D. Tenn. 1988) and cases cited

therein (so holding); FDIC v. Dempster, 637 F.Supp. 362, 366 (E.D. Tenn. 1986)(striking

---

[24] See also, In re F & T Contractors, Inc., 718 F.2d 171 (6th Cir. 1983)(concluding that FDIC-C was not liable on counterclaim brought by trustee of debtor in bankruptcy because it did not assume any liability with respect to letters of credit when it agreed to purchase the unacceptable assets of a failed bank from the FDIC-R, and therefore, was not susceptible to a contract action against it for the wrongful termination of such letter).

affirmative defenses brought against the FDIC in a capacity different than that of the FDIC as plaintiff).

In this model, when the FDIC acts in a purely proprietary capacity it is liable for its own negligence, and that negligence can be the basis of an affirmative defense.  FDIC v. Carter, 701 F.Supp. 730, 736-737 (C.D. Cal. 1987).  And thus, if it acts in a corporate capacity to sell an asset (a hotel) of a failed bank acquired from the FDIC as receiver, its contractual liability is determined in the same fashion as that of a private party.  See, Santoni v. FDIC, 677 F.2d 174, 178 (1st Cir. 1982)(so holding).

At the same time, there is a dividing line.  In general, it is the date the FDIC assumes receivership of a bank.  Carter, 701 F.Supp. at 737.  Before that point, its regulatory decisions are beyond scrutiny in a damages action by way of affirmative defenses or otherwise.  As is apparent from information laid out in footnote 16, "broker deposits" fall within the purview of the FDIC's regulatory authority.   Therefore, the directors are precluded from attacking those regulatory decisions arguing that the FDIC's acts and omissions before it was appointed receiver totally or partially caused the damages the receiver seeks to recover.[25]

### D.  Great Recession

Arrillaga points out that to present a jury question, the FDIC has to put on evidence that his vote to approve the loans was the proximate cause of its alleged damages, and that these did

---

[25] See, FDIC v. Ashley, 749 F.Supp. 1065, 1068 (D. Kan. 1990)(comparative negligence not available against the FDIC as to its regulatory pre-bank closing capacity); FDIC v. Blackburn, 109 F.R.D. 66, 71 (E.D. Tenn. 1985)(rejecting argument that directors have the right to show at trial by way of causation or intervening cause that it was the malfeasance or nonfeasance of the FDIC which caused the bank to fail); FDIC v. Niblo, 821 F.Supp. 441, 454-456 (N.D. Tex. 1993)(striking comparative responsibility defense even though it involves purely defensive matter, not an affirmative action for payment from any assets of the FDIC, because it sought to examine the FDIC's pre-closing activities).  To that extent, affirmative defenses raising those issues in the Directors' and Arrillaga's Answers (Docket No. 45, Defenses 13, 17, 19; Docket No. 48, Defenses 2, 3, 4, 25, 30, 31; Docket No. 200, Defenses 12, 13, 17, 18, 19), fail as a matter of law.  Affirmative defenses referring to mitigation or asserting or suggesting that the FDIC caused losses will not be considered legally insufficient because, given the court's analysis and conclusions, those defenses may be asserted against the FDIC-R for its own post-appointment acts and omissions.

not result from an independent cause reasonably unforeseeable when the loans were approved
(Docket No. 378 at p. 7). He asserts that no such evidence exists to the extent needed to support
the FDIC's claims of loss because of the Great Recession. Id.[26]

Liability requires a finding of causation linking the defendant's breach of care with the
asserted loss. Soto-Cabral v. E.L.A., 138 D.P.R. 298, 317 (1995); Arthur R. Pinto & Douglass M.
Branson, *Understanding Corporate Law*, 212 (2d ed. 2004); Brau Del Toro, supra at 181.
Causality is limited in scope by the obligation to which it refers, for otherwise, damages following
a breach may be linked to each other in an endless chain of events. See, Arroyo v. Estado Libre
Asociado, 126 D.P.R. 682, 690 (1990)(so stating); Brau Del Toro, supra at 711 (pointing out
delimiting principle underlying causation). It is applied through the concept of "adequate
causality," meaning, the condition that ordinarily causes the damage, according to common
experience. Cárdenas-Maxán v. Rodríguez, 125 D.P.R. 702, 710 (1990); Jiménez v. Pelegrina
Espinet, 112 D.P.R. 700, 704 (1982).

In turn, the causal nexus rests on foreseeability. Vázquez-Filippetti v. Banco Popular de
Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007); Barreiro-López v. Universal Ins. Co., 98 F.Supp.3d
349, 356 (D.P.R. 2015). It cannot be satisfied unless the plaintiff proves that the injury was
reasonably foreseeable and thus, could have been avoided had the defendant acted with due care.
Grajales-Romero v. American Airlines, Inc., 194 F.3d 288, 296 (1st Cir. 1999); Woods-Leber v.
Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 50-51 (1st Cir. 1997).

Arrillaga argues the FDIC cannot satisfy the foreseeability standard as a matter of law,
because a banker like him cannot be held liable for failing to see a systemic economic meltdown

---

[26] On Arrillaga's description, the term "Great Recession" is a term economists have used to describe the global economic crisis that began with the bursting of the sub-prime mortgage bubble in 2007, continued with the implosion of Lehman Brothers in 2008, and began easing in the summer of 2009 (Docket No. 419 at p. 3, n.1).

such as the Great Recession that the Secretary of the Treasury, the Chairman of the Federal Reserve and the FDIC failed to foresee (Docket No. 378 at p. 7). The FDIC contends that according to common experience, a grossly negligently underwritten and approved loan will ordinarily and foreseeably result in a loss for the bank regardless of whether a recession occurs (Docket No. 413 at p. 35). The record contains evidence that would allow the jury to conclude that the Directors reasonably foresaw a recession when they decided to approve the loans.

The 2005 Eurobancshares 10-K, which all defendants signed, stated that "[t]he year 2005 began in Puerto Rico under the threat of a fiscal crisis and the onslaught of high petroleum prices. Accordingly, earlier in the year these conditions suggested an economic slowdown." Moreover, it noted that Moody's placed Puerto Rico's general obligations on "watch" for a possible downgrade, and additionally warned that "[r]ecent increases in the price of gasoline and several basic services and utilities are negatively affecting the purchasing power of local consumers, which undoubtedly have been the key driver of the Puerto Rico economy in recent years …." (Docket No. 413 at pp. 36-37).

The 2006 10-K recognized that "the recent economic and government budget crisis" in Puerto Rico could adversely affect its loans. It pointed out that:

> [a]n economic downturn, such as this, could contribute to the deterioration of the quality of our loan and corporate bond portfolios. During an economic downturn, affected borrowers may be less likely to repay interest and principal on their loans or bonds as scheduled. Moreover, the value of real estate or other collateral that secures the loans and bonds could be adversely affected by an economic downturn. This would cause the number of foreclosures to increase and, therefore, decrease our ability to recover losses on such properties and assets.

(Docket No. 413 at pp. 37-38).

In the 2006 Eurobancshares Annual Report's Chairman's Message, Arrillaga admitted to the crisis, describing it as a "perfect storm." He described the storm as being caused, in part, by the fiscal crisis and the consequences thereof, which included among others, the deterioration of the Puerto Rico economy, higher taxes, and weakening credit quality. He further described the economy as stagnant, and having a recessionary flavor, exacerbated by a government shutdown in May 2006, which caused many businesses to place capital projects on hold until the situation clarified, and which impacted consumer credit. Finally, he claimed that the deteriorating economy strengthened the Bank's resolve to continue to tighten credit standards and controls for all products (Docket No. 413 at p. 37).

The 2007 Annual Report stated that "the most important economic factor affecting our ability to generate income was related to the local economic recession. Credit quality deteriorated and non-performing loans increased significantly. The 2007 10-k recognized that "[a] period of reduced growth or recession, such as this, has had an adverse effect on the quality of our loan and corporate portfolios." Id. at p. 38.

Construing the evidence in light most favorable to the FDIC, a jury could reasonably conclude that defendants approved the loans against the backdrop of the economic situation described in these reports, and if so, to find, that defendants' gross negligence in approving questionable loans under those circumstances foreseeably lead to loss. Arrillaga claims the argument is essentially misguided, because the issue is not whether a recession in Puerto Rico was an intervening, superseding cause, but whether the Great Recession was such a cause, decimating an already weakened Puerto Rico economy in a way that nobody ever had seen in Puerto Rico's history (Docket No. 438 at p. 29).

Even so, the question is whether it was foreseeable that the loans would have been timely paid given the conditions under which they were approved, including the economic climate within which the bank was and expected to be operating during the life of the loans.  Foreseeability does not mean that the precise risk or the exact result which was encountered should have been foreseen.  Malavé-Felix v. Volvo Car Corp., 946 F.2d 967, 972 (1st Cir. 1991); Woods-Leber, 124 F.3d at 50-51.  By extension, anticipating the exact magnitude or duration of a recession is not strictly necessary to causally link the alleged breach of care to the asserted loss.  If the defendants saw or foresaw a recession, that recession may not necessarily qualify as an intervening cause breaking up a foreseeable causality chain.  A recession within a recession is a recession with varying effects on economic activity.

A negligent defendant is not relieved from liability by an intervening cause that was reasonably foreseeable, even if the intervening cause may have directly caused the harm.  Marshall v. Pérez-Arzuaga, 828 F.2d 845, 848 (1st Cir. 1987).  Nevertheless, a defendant, even though negligent, will be relieved of liability whenever an intervening cause produces an unforeseeable result.  Barreiro-López, 98 F.Supp.3d at 356.  Proximate (adequate) cause is not proven if the defendant can show the occurrence of an intervening cause that was not foreseeable.  Wojciechowicz v. United States, 582 F.3d 57, 67 (1st Cir. 2009).  The breach –if proven- and the surrounding developments interact to dictate the result.

For that reason, the relative roles, if any, of the Great Recession or a Puerto Rico Recession in bringing about the losses the FDIC seeks to recover are contested.  The question of cause, including whether an intervening cause of the injury was reasonably foreseeable, is one for the factfinder.  See, Federal Exp. Corp. v. State of R.I., Dept. of Transp., Airports Division, 664 F.2d 830, 838 (1st Cir. 1981)(so recognizing).  In consequence, it is up to the jury to determine whether

the losses were reasonably foreseeable, and if they could have been avoided had the defendants acted with due care.  Grajales-Romero, 194 F.3d at 296; Woods-Leber, 124 F.3d at 50-51.[27]

### E.  Articles of Incorporation

The Directors raise as a defense or bar against recovery, Eurobank' article of incorporation (Docket No. 45, Defense 2; Docket No. 48, Defense 14; Docket No. 200, Defense 2).  Although the point is not well developed, it seems those articles include a clause barring liability against them for breach of fiduciary duties (Docket No. 364 at p. 25).  Article 1.02(B)(6) of the Law of Corporations of Puerto Rico provide that articles of incorporation may include a provision to eliminate or limit the personal liability of the directors or stockholders of a corporation in cases of monetary claims for damages resulting from the breach of the fiduciary duties as director, provided that such provision does not eliminate or limit the liability of the director for any breach of the director's duty of loyalty; for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law; for any transaction whereby the director derives an improper personal benefit, or under Article 5.22 of the law.  P.R. Laws Ann. tit. 14 § 2602.

To the extent those exceptions are not present here, Eurobank's purported limits on directors' liability for breach of fiduciary duties may not infringe the Law of Corporations of Puerto Rico.  But in the court's view, such insulation is pre-empted by FIRREA, which permits claims against directors and officers for gross negligence regardless of whether state law would require greater culpability.  See, 12 U.S.C. 1821(k).  As stated in Stahl, Congress intended §1821(k) to preempt the applicability of state insulating statutes for grossly negligent actions.  See, FDIC v. Stahl, 89 F.3d 1510, 1516 (11th Cir. 1996)(citing 135 Cong. Rec. S4278-79 (daily ed.

---

[27] If the defendants acted with due care (that is, if they were not grossly negligent), they are not liable for the loss.

Apr. 19, 1989)(statement of Senator Riegle).  Under those circumstances, articles of incorporation may not be asserted against the FDIC in its receiver capacity to shield directors from liability predicated on breach of fiduciary duty based on gross negligence.  See, FDIC v. Clementz, 2013 WL 6513001, *5-6 (D. Wash. Dec. 12, 2013)(denying motion to dismiss grounded on insulating provisions of articles of incorporation allowed by state law).

### F.  Insurers

#### 1.  Background

Liberty sold the Executive Advantage Policy, Policy No. D04N44486004, to Eurobanshares, Eurobank's holding company, providing $10 Million in insurance coverage to Eurobanshares and to the Bank, its directors and officers (Docket No. No. 73 at p. 14; Docket No. 358 at p. 4).  Ace sold the Excess Liability Insurance Policy, Policy No. DO1466, with a $10 Million excess coverage for the Bank and its directors and officers (Docket No. 358 at p. 4).  The Policy "follows form" to the Liberty policy, stating that ACE "agrees to provide insurance coverage to the Insureds in accordance with the terms, conditions, exclusions and limitations of the Followed Policy, except as otherwise provided therein."  Id. at pp. 4-5.  The Followed Policy is identified as the Liberty Policy.  Id. at p. 5.

XL issued an A-Side Management Liability Insurance Policy, Policy No. ELU114018-09 (Docket No. 365-1 at p. 3).  The Policy states that XL will pay loss on behalf of the Insured Persons except to the extent that such loss is paid by any other Insurance Program or as indemnification from any source, coverage being excess over any Insurance Program maintained by the Company, whether such other insurance is stated to be primary, contributing, excess or otherwise (Docket No. 365-1 at p. 3).

Federal Deposit Insurance Corporation v. Arrillaga-Torréns *et al.*
Civil No. 13-1328 (PAD)
Opinion and Order
Page 53

The Insuring Agreement portion of the Liberty Policy states that the Insurer shall pay on behalf of the Insured Persons all Loss which they become legally obligated to pay as a result of a Claim against the Insured for a wrongful act which takes place before or during the policy period (Docket No. 358 at p. 5; Docket No. 376 at p. 4).  The policy defines the term "wrongful act" as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed by the Insured Persons in their capacities as such […] or by the Insured Organization" (Docket No. 358 at p. 5).  The claims against the directors are for negligence and breach of fiduciary duty regarding loan approvals (Docket No. 1 at §§ 79-81).  Clearly, the Directors are covered for any wrongful act committed in their capacities as such –the basis of the FDIC's claim– unless an exclusion deprives them of coverage.

Liberty and ACE contend that coverage is not available because of two exclusions, the Insured v. Insured ("I v. I") Exclusion, and the Professional Services ("PS") Exclusion.[28]  XL maintains it only agreed to provide excess coverage, and as such, is not implicated by the FDIC's claim against the Directors unless or until the full limits of liability provided under the Liberty and ACE policies are exhausted by payments by those insurers (Docket No. 365-1 at p. 2).  The FDIC and the Directors challenge the Insurers' views, stating that the "I v. I" and "PS" exclusions do not apply or are ambiguous and therefore, must be interpreted strictly against the Insureds to require coverage (Docket No. 92 at pp. 2-3; Docket No. 117 at pp. 1-3, 9; Docket No. 358 at pp. 9, 25; Docket No. 410 at pp. 6, 17-19; Docket No. 404 at pp. 1-2, 29, 34).  As for XL, the FDIC claims XL is in a co-primary rather than in an excess position here (Docket No. 399 at pp. 1, 7).

---

[28] These arguments were raised in Liberty Mutual's "Motion for Judgment on the Pleadings" (Docket No. 73 at pp. 13-14), in the "Joint Motion for Summary Judgment" filed by Liberty Mutual and ACE (Docket No. 376 at p. 7), and in Liberty Mutual's and ACE's "Joint Response in Opposition to FDIC-R's Motion for Partial Summary Judgment against Liberty Mutual Insurance Company and ACE Insurance Company" (Docket No. 427 at p. 12).  Unless otherwise stated, Liberty and ACE will be jointly referred to as the "Insurers."

2.  <u>Legal Standard</u>

The Puerto Rico Insurance Code governs insurance contracts in Puerto Rico.  The contract's terms are set forth in the policy.  <u>Natal-Cruz</u> v. <u>Santiago-Negrón</u>, 188 D.P.R. 564 (2013)(<u>citing</u> <u>Maderas Tratadas</u> v. <u>Sun Alliance et. al.</u>, 185 D.P.R. 880 (2012).  They are accorded their ordinary meaning, as amplified, extended, or modified by any lawful rider, endorsement, or application attached to, and made part of the policy.  P.R. Laws Ann. tit. 26 § 1125; <u>Marina-Aguila</u> v. <u>Den Caribbean, Inc.</u>, 490 F.Supp.2d 244, 248 (D.P.R. 2007); <u>Metlife Capital Corp.</u> v. <u>Westchester Fire Ins. Co.</u>, 224 F.Supp.2d 374, 382 (D.P.R. 2002).  When they are clear and unambiguous, they must be applied and enforced as written.  <u>Marina-Aguila</u>, 490 F.Supp.2d at 249.

Ambiguity does not exist simply because the parties disagree about the proper interpretation of a policy provision.  Rather, it may be found where the policy's language is susceptible to more than one rational interpretation.  <u>Clark School for Creative Learning, Inc.</u> v. <u>Philadelphia Indem. Ins. Co.</u>, 734 F.3d 51, 55 (1st Cir. 2013).  The same is true with respect to exclusions.  <u>Natal Cruz</u>, 188 D.P.R. at 583.  A term is not ambiguous merely because it eliminates coverage.  <u>MAPFRE Puerto Rico</u> v. <u>Guadalupe-Delgado</u>, 613 F.Supp.2d 213, 217 (D.P.R. 2009).  If a policy is capable of being construed two ways, however, it will be construed against the insurance company and in favor of the insured.  <u>Metlife Capital Corp.</u>, 224 F.Supp.2d at 382.[29]

3.  <u>Analysis</u>

a.  <u>*I v. I Exclusion*</u>

The "I v. I" exclusion states that the Insurer shall not be liable to make any payment for Loss in connection with any Claim "brought or maintained **by or on behalf** of the Insured

---

[29] According to one court, construing ambiguities to benefit insurers would create perverse incentives, as it would encourage insurers to build ambiguities into their policies to defeat claims.  <u>See</u>, <u>St. Paul Mercury Ins. Co</u>. v. <u>Hahn</u>, 2014 WL 5369400, *4 (C.D. Cal. Oct. 8, 2014)(so stating).

Organization or any Insured Person, in any capacity" (Docket No. 377, Exh. 5 at ¶ 5.6)(emphasis added).   The Insurers argue the Exclusion is not limited to claims brought by the Insured Organization (that is, Eurobanshares or Eurobank as Eurobanshares' subsidiary), or by Insured Persons (in other words, the directors and officers of the Insured Organization), but that it covers entities asserting claims *on behalf of* an Insured (Docket No. 73 at pp. 1-2; 24, 26; Docket No. 376 at pp. 13-14, 31-35; Docket No. 427 at pp. 16-20).   They posit that is precisely what is taking place in this case.   Id.   The FDIC and the Directors counter the Exclusion does not reach the FDIC's claim, and in any event, the Exclusion is ambiguous (Docket No. 88 at pp. 1-2, 10; Docket No. 117 at pp. 1-3; Docket No. 358 at p. 9; Docket No. 410 at pp. 14-18).

A primary purpose of the "I v. I" Exclusion is to preclude coverage for collusive lawsuits between insureds.   *Couch on Insurance 3d*, §131:33, p. 131-40; *New Appleman Law of Liability Insurance* § 22.06[2](c) (2015); Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 20.05[d][1] (17th ed. 2015).[30]   The FDIC, however, is not an insured party.   As receiver, it succeeds to all rights, titles, powers and privileges of the insured depository institution, and of any stockholder, member, accountholder depositor, officer, or director of such institution with respect to the institution and the assets of the institution.   12 U.S.C. § 1821(d)(2)(A).   As such, it may pursue, in its own right, claims against a failed bank's directors and officers for breach of their duties to the bank.   See, 12 U.S.C. § 1821(1)(k)(so authorizing).   Those claims belong to the FDIC, not to a failed bank or anybody else.[31]   As a unique entity created and authorized by statute to act

---

[30] Historically, the Director and Officer ("D & O") policy did not exclude claims by one insured against another insured.   Because of several lawsuits in the 1980's brought by corporations against their directors and officers under circumstances that created an appearance that the corporation was simply trying to concert its D & O policy to cash by suing its own director and officers, virtually all D & O polices now exclude claims brought by one insured person or company against another insured.   *New Appleman on Insurance* at §26.07 (3)(d).

[31] See, Levin v. Miller, 763 F.3d 667, 671 (7th Cir. 2014)(holding the FDIC owns claims that depend on choices people make as directors or employees of a failed bank); In re Beach First Nat. Bancshares, Inc., 702 F.3d 772, 778-779 (4th Cir. 2012)(concluding

Federal Deposit Insurance Corporation v. Arrillaga-Torréns *et al.*
Civil No. 13-1328 (PAD)
Opinion and Order
Page 56

in multiple capacities as part of a complex regulatory scheme, the FDIC does not neatly square

with those of agents, proxies or representatives.  It is that role which distinguishes the FDIC from

those whom the parties may have intended to prevent from bringing claims under the "I v. I"

Exclusion. W Holdings Co., 904 F.Supp.2d at 184 (so concluding).

        The Insurers attack reliance on the FDIC's role to support coverage, pointing to Levin, 763

F.3d at 667.  They assert Levin recognized that FIRREA does not transfer to the FDIC every claim

a creditor or shareholder may have against the Bank, but rather that "the FDIC succeeds to those

claims that could be asserted on behalf of the Bank (i.e. an Insured Organization)"(Docket No. 376

at pp. 14-15).  They quote from Levin that, "[n]o federal court has read the statute" to mean "that

FIRREA divests shareholders, depositors and the like of all claims they might hold against the

failed bank's directors or officers." (Docket No. 376 at p. 15).

        For the Insurers, "Levin … teaches that although the FDIC-R has the statutory authority to

act on behalf of various non-insured constituencies, the FDIC-R is not actually doing so in any

given lawsuit with respect to direct claims those non-insured might have."  And, "[t]his is because

the FDIC-R may only assert those claims that the different constituent groups could have asserted

derivatively on behalf of Eurobank but for the receivership (i.e. on behalf of an Insured

Organization)."  Id. at pp. 15-16.

        From those premises, the Insurers argue that "[a]s a result, the FDIC-R's claim falls within

the I v. I Exclusion's scope regardless of which constituent 's group claim the FDIC-R purports to

assert here because those constituents-whether they are shareholders, depositors or creditors, still

--------

that under FIRREA, the right to pursue derivative claims against directors of a failed bank belongs to the FDIC); Lubin v. Skow,
382 Fed.Appx. 866,870 n.6 (11th Cir.  September 28, 2010)(FIRREA grants the FDIC ownership over all derivative claims against
the bank's officers); Pareto v. FDIC, 139 F.3d 696, 701 (9th Cir. 1998)(FDIC possesses all of the accouterments of claim
ownership); Barnes v. Harris, 2013 WL 6732122, *1, *3 (D.Utah December 19, 2013)(FIRREA gives the FDIC ownership of
claims against bank's directors and officers after the bank is closed and the FDIC is appointed receiver).

retain their direct claims" (Docket No. 276 at p. 16).  Otherwise, they note, the situation "would pose the question whether [the shareholders or depositors] would be entitled to compensation for a taking …" Id. at 15.  They acknowledge (as they must) that "courts have found that certain insured versus insured exclusions did not bar claims brought by the FDIC-R against certain failed bank's directors," id. at 16 n.10, yet assert that "those courts failed to consider" what the Insurers have characterized as "the Levin court's better-reasoned rationale." Id.

Levin is not an insurance coverage case examining the scope of the "I v. I" Exclusion, but rather if certain claims brought by the trustee in bankruptcy of a bank holding company were properly dismissed.  The holding company had entered bankruptcy when its subsidiaries failed.  Propriety of dismissal depended on the ownership of the claims, such that claims belonging to the FDIC were properly dismissed.  Along that line, Levin held that, "[t]he FDIC [not the shareholder] owns any claim against the Managers that depends on the choices they made as directors or employees of the [failed] Banks." Id. at 670-671.[32]  Thus, Levin does not help the Insurers on the core issue here.[33]

The Insurers take issue with this conclusion because the FDIC is suing to recover losses the bank suffered (Docket No. 73 at pp. 14-15, 19-20; Docket No. 427 at pp. 14, 16).  It is true that is where the losses originated, but the origin of the loss does not translate into a finding that the

---

[32] See also, In re First Beach Nat. Bancshares, Inc., 702 F.3d at 779 (concluding that trustee in bankruptcy lacks standing to pursue derivative claims under FIRREA, "as the right to pursue such claims belongs to the FDIC").

[33] What is more, concurring with the Court's opinion, Judge Hamilton noted that the statutory language could be interpreted to include a stockholder's direct claims based on harms resulting from dealings with assets of a failed institution, or at least claims against other persons and entities who were part of the holding company's structure. Id. at 673.  And in connection with the taking aspect, see Golden Pacific Bancorp. v. United States, 15 F.3d 1066 (Fed.Cir. 1994), where the Court rejected a bank holding company's fifth amendment taking claim because, among other things, the company voluntarily entered into the highly regulated banking industry by choosing to invest in a bank before it failed, and the regulator simply enforced portions of an extensive regulatory scheme designed to promote the public interest in a sound banking system when it ordered the bank closed and placed on a receivership. Id. at 1073-1074.  These issues, however, need not be examined at length to evaluate the questions raised in the instant case.

FDIC is suing on behalf of the bank.  The governing statute specifies where the money goes if the FDIC prevails,[34] and it is not Eurobank.  As Liberty acknowledges, "Eurobank no longer exists" (Docket No. 73 at p. 30).  In consequence, the FDIC reaps no benefits comparable to those enjoyed by collusive actors who seek to swindle insurance companies.  See, W Holdins Co., 904 F.Supp.2d at 184 (so noting).  Insurers do not run the risk of a collusive suit such as those that led insurers to adopt the clause, when a regulatory agency brings the underlying action as a receiver of a failed financial institution.  Niemuller v. National Union, 1993 WL 546678, *5 (S.D.N.Y. Dec. 30, 1993)(so recognizing).

The Insurers contend it is irrelevant what the origin of the clause was when its language is clear as they say it is here, and relying on O'Melveny, 512 U.S. at 79, state the "I v. I" Exclusion applies because the FDIC stepped into the shoes of Eurobank (Docket No. 73 at pp. 35-36).  Even though, as noted above, O'Melveny states that the FDIC steps into the shoes of a failed bank, 512 U.S. at 86, its holding does not concern insurance or an "I v. I" Exclusion requiring interpretation of the phrase "on behalf of."  Similarly, it does not say whether, as a matter of law, "on behalf of" is the equivalent of, or means the same thing as "steps into the shoes of."  In fact, it never mentions the word "behalf" in the decision, for it did not purport to interpret, much alone construe any "insured v. insured" exclusion.  To that end, see Hahn, 2014 WL 5369400 at * 4 (stating that as to the meaning of 'on behalf of,' O'Melveny offers little guidance), and Progressive Cas. Ins. Co. v. FDIC, 80 F.Supp.3d 923, 949-950 (N.D. Iowa 2015)(asserting that O'Melveny is all but irrelevant to the disposition of the "I v. I" Exclusion issue in the case).

[34] See, 12 U.S.C. § 1821(d)(11)(A)(receiver's administrative expenses must be satisfied before outstanding deposit liabilities, which must be satisfied before general liabilities, including, in the following order: (1) obligations subordinated to depositors or general creditors, and (2) obligations to shareholders or members, arising as a result of their status as such).

The Insurers state the FDIC-R "failed to identify in discovery which supposedly non-Insured persons or entities on whose benefit it brings the claim" (Docket No. 376 at p. 16).  They state Liberty asked the FDIC-R to admit that it "is not asserting any claims on behalf of Eurobank's [creditors, depositors, stockholders or members] in the FDIC-R Complaint" and point out that "[t]he FDIC's response to each such request simply restated the same statutory authority provided by FIRREA," adding that "[t]o what extent, FDIC-R is asserting claims on behalf of Eurobank's [stockholders, depositors, etc.] in the FDIC-R Complaint." Id.

For the Insurers, "[t]his is not an affirmative statement of whether the FDIC-R is in fact bringing claim on behalf of anyone other than the Bank," Id., and "the FDIC-R's elusive responses should be accepted for that they are – the absence of a factual answer to the central question on whose claim it is asserting," entitling the Insurers to summary judgment.  Id. at 17.  The same argument was considered and rejected by a sister Court in W Holdings Co. v. AIG, 2014 WL 2014 3378671, *14 (D.P.R. Jul. 9, 2014).

The court agrees with the sister court, for the FDIC is not the functional equivalent of a failed bank.  It has independent authority to bring suit, motivated by interests distinctly different from that of a failed financial institution.  See, W Holding Co., Inc., 904 F.Supp.2d at 183 (recognizing diversity of interests coalescing around FDIC's mandate); American Cas. Co. of Reading v. Federal Sav. And Loan Ins. Corp., 704 F.Supp. 898, 901 (E.D. Ark. 1989)(same in context of FSLIC); Niemuller, 1993 WL 546678 at *3-4 (describing the FDIC as an entity with a unique character possessing independent claims for losses it incurred due to directors' alleged misfeasance).  And neither the exclusion nor the defined terms of the Policy make any reference

to the FDIC or banking regulators, even though the parties could have incorporated a Regulatory Exclusion in the Policy to preclude coverage in this type of case.[35]

The Insurers state it is immaterial that the parties could have adopted a Regulatory Exclusion, citing to cases where courts have applied the "I v. I" Exclusion to FDIC claims in absence of a Regulatory Exclusion (Docket No. 73 at pp. 36-37; Docket No. 102 at pp. 31-33; Docket No. 427 at p. 20). The FDIC and the Directors respond with cases where courts have reached the opposite conclusion (Docket No. 88 at pp. 6-10; Docket No. 92 at pp. 16-17; Docket No. 358 at pp. 2-4). One of the cases the Insurers rely on, St Paul Mercury Insurance Company v. Miller, 968 F.Supp.2d 1236 (N.D. Ga. 2013), concluded, based on arguments the Insurers advance here, that under the terms of the "I v. I" exclusion of the Policy, the insurer was "under no duty to provide coverage for the suit instituted by the FDIC …" Id. at 1244.[36] The Eleventh Circuit, however, reversed in St. Paul Mercury Insurance v. FDIC, 774 F.3d 702, 711 (11th Cir. 2014).

The Eleventh Circuit summarized the arguments for and against exclusion, but opted not to resolve the disagreement between the parties. Id. at 706-708. It stated that courts have addressed similarly worded insured v. insured exclusions, reaching different results, and that there are two schools of thought on how to interpret "I v. I" exclusions. Id. at 709-710 n.2. Further, it pointed out that if courts cannot with any degree of assurance or unanimity interpret exclusion provisions of this kind, such fact alone weighs heavily against the insurer because the fine print of the policy,

---

[35] A high rate of bank and savings and loan failures beginning in the early-to-late 1980's prompted regulatory agencies such as the FDIC and the Federal Savings and Loan Corporation, which became insolvent in 1986 and was ultimately abolished and merged into the FDIC, to bring civil suits against bank and savings and loan board members and executives. The insurance industry faced losses resulting from substantial payouts, and responded by inserting into liability policies regulatory exclusion clauses to deny coverage (1) upon the appointment of a regulatory agency as receiver of a financial institution; or (2) for claims brought by or on behalf of a regulatory agency. *Couch on Insurance 3d*, §131:34, p. 131-40,131-41; *New Appleman Law of Liability Insurance,* § 22.06(2)(i) at 22-72 (Lexis Nexis 2015); Martin O'Leary, *Directors & Officers Liability Insurance Deskbook* 2d, 154 (A.B.A. 1997).

[36] See, Docket No. 73 at pp. 32-33; Docket No. 102 at pp. 30-31.

where ambiguous, is construed in favor of the insured.  Id. at 710.  And so it concluded that the "I v. I" exclusion is ambiguous.  Id. at p. 711.[37]

In W Holding Co., Inc. v. AIG Ins. Co., 748 F.3d 377, 386 (1st Cir. 2014), the First Circuit rejected the insurer's argument that the "I v. I" exclusion exempted it from providing coverage, and by extension, in light of the issues raised therein, from the obligation to advance defense costs. The litigation was like the one at bar, in that the FDIC sued former directors (and officers) for breach of fiduciary duty resulting in loss to a failed depository institution.  The parties cited to cases with conflicting interpretations of the "I v. I" exclusion, which to the First Circuit amounted to "a classic battle of dueling caselaw …," in the context of a "frenetic motion practice."  Id. at pp. 385-386.

For the First Circuit, "such state of affairs" hurt the insurer.  Id. at 386.  It noted that with no controlling authority on whether an insured versus insured exclusion applies to the FDIC in a situation like this, with non-binding cases pointing in different directions, and with a judicial obligation to resolve any doubts in the insured's favor, the insurer could not prevent relief against it on the issue of advancing costs, dependent as it was, on the possibility rather than the probability or actuality that coverage existed under the policy.  Id.  Given that the test used to assess coverage at that stage of the litigation was different from the one to be used in a definite adjudication on the merits, the First Circuit added that the insurer could still win "the coverage war" at a succeeding trial on the merits."  Id.

---

[37] The Court in Hahn reached the same conclusion, stating that the ambiguity of the "I v. I" Exclusion as applied to the FDIC is evidenced by the fact that courts considering this exclusion have reached varying conclusions. See, 2014 WL 5369400 at *3.  Along the same line, it observed that this question has been litigated numerous times over many years on courts across the nation, and that "[t]here can be little doubt that repeated disputes over the … Exclusion have placed insurers on notice that it is ambiguous."  Id. See also, Progressive Casualty, 80 F.Supp.3d at 949-950 (concluding that "I v. I" Exclusion is ambiguous).

Applying <u>W Holding</u> earlier in the litigation, this court rejected the insurers' contention that coverage does not exist, and ordered them to advance defense costs (Docket No. 353).  As the First Circuit recognized, however, likelihood of success is not success.  <u>Id.</u> (so noting)(<u>citing University of Texas</u> v. <u>Camenisch</u>, 451 U.S. 390, 394 (1981) and <u>Narragansett Indian Tribe</u> v. <u>Gilbert</u>, 934 F.2d 4, 6 (1st Cir. 1991)).  But in the end, there are two schools of thought on how to interpret "I v. I" exclusion.[38]  The court follows the First Circuit in recognizing that that there is no controlling authority on this issue and subscribes to the Eleventh Circuit's view in <u>St. Paul Mercury Insurance</u>, 774 F.3d at 711, that under these circumstances the "I v. I" exclusion is ambiguous.[39]

### b.  *Professional Services Exclusion*

The Exclusion states the Insurer shall not be liable to make any payment for Loss in connection with any Claim based upon, arising from, or in any way related to the rendering of or failure to render professional services of any kind or nature to or on behalf of any customer or client of the Insured Organization (Docket No. 377-5 at ¶ 5.11).  It does not apply to claims brought or maintained by a customer or client of the Insured Organization, whether directly, by class action, or by derivative action, when the claim is based upon the failure of an Insured Person to properly

---

[38] Notwithstanding the difference in views, most courts have held that a claim by the FDIC or similar regulator against bank directors and officers does not implicate the "I v. I" exclusion.  <u>See</u>, *New Appleman Law of Liability Insurance*, 2015, LexisNexis, § 22.07(3)(d), p. 26-44(so noting); Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 20.05[d][2], p. 1601 (17th ed. 2015)(pointing out that "the majority of courts have found that the exclusion does not bar coverage for actions brought by bank regulators").  <u>See also</u>; <u>Hahn</u>, 2014 WL 5369400 at *3 (concluding that "[a] majority of better-reasoned opinions holds that the 'insured v. insured' exclusion does not unambiguously exclude suits by the FDIC from coverage"(<u>quoting</u> Peter D. Rosenthal, *Have Bank Regulators Been Missing the Forest for the Public Policy Tree? The Case for Contract-Based Arguments in the Litigation of Regulatory Exclusions in Director and Officer Liability Policies*, 75 B.U.L. Rev. 155, 173-174 (1995)).

[39] Liberty asserts that an exception to coverage was carved out for receivers, but they must be receivers in a proceeding under the Bankruptcy Code (Docket No. 102 at pp.13-14)( the clause appears at Docket No. 377, Exh. 5 at ¶ 5.6(d).  Given that the FDIC is not such a receiver, Liberty contends coverage is not available.  <u>Id.</u>  The argument falls short, because this is not a bankruptcy-related proceeding where application of the exception might make sense but an action pursuant to the FDIC's authority under FIRREA beyond the scope of the policy's "*I v. I*" Exclusion.

supervise or manage such professional services, or based upon improper disclosure or nondisclosure of material information relating to such professional services.  Id.

The Insurers contend that the "PS" exclusion precludes coverage.  They allege courts have consistently recognized that the term applies broadly to any activities requiring specialized skill, knowledge, experience or training, and that such is the case with loan approvals (Docket No. 73 at pp. 39-40; Docket No. 376 at pp. 19-22).  They point out the loss loan approvals were the result of each Director's "thorough, independent analysis, which required each director's application of his or her professional underwriting skill and knowledge", and that those approvals were made to and on behalf of clients or customers applying for loans (Docket No. 376 at pp. 22-23).

The court has reservations that lending falls within the category of professional service within the scope of the "PS" exclusion here.  In In re Reinforced Earth Co., 925 F.Supp. 913 (D.P.R. 1986), a sister court pointed out that "professional services" are services performed by one in the ordinary course of the practice of his profession on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due.  Id. at 918.  It is unclear whether the Directors were in the practice of their respective professions when they made the decisions leading up to the present case.

The Insurers state the Directors were providing professional services when they approved loans (Docket No. 73 at pp. 39-40; Docket No. 102 at pp. 36-37; Docket No. 376 at p. 22; Docket No. 427 at pp. 23-24).  But neither the Policy nor the PS Exclusion defines "professional services" to include "loan review and approval" as activities to be excluded from coverage.  There is no definition of "professional services" at all.  It is not apparent that the Directors were providing a service to a client or customer rather than to the bank itself in evaluating loan applications and approving loans.

The Insurers contend that "D & O" policies such as Eurobank's are issued to cover supervisory and managerial decisions distinct from an insured's rendering of professional services, for which professional liability policies are issued, and to interpret otherwise would result in overlapping coverage contradicting well-established industry practice and the law (Docket No. 376 at pp. 21-24; Docket No. 427 at pp. 28-30).   It is uncertain what well-established industry practice was in Puerto Rico, or what the practice or understanding was in Eurobank.   If a Director had been an attorney or accountant providing advice during a recess in a board meeting to a personal client who happened to be a customer or client of the bank, and that advice resulted in a malpractice claim against the attorney or accountant, application of the PS Exclusion would make perfect sense on the logical view that if that director wished protection against liability for practicing his profession rather than for serving as a director, he should have purchased a Professional Liability Policy linked to his profession.

According to one treatise, directors and officers liability coverage mirrors other professional liability insurance in that it is designed to protect corporate officials from loss in the event of a claim made against them in their official capacities, the focus being on whether there has been a negligent act, error or omission.   *Couch on Insurance 3d* § 131:1 at pp. 131-6, 131-7. In the same way *New Appleman Law of Liability Insurance*, supra at  p. 22.3 recognizes that "[a]t its most fundamental level, directors' and officers' liability ('D & O') insurance protects corporate directors and officers from third-party claims made against them in their capacity as directors and officers for breaches of their duties to their corporations and shareholders").   So the claim that coverage here would contradict industry practice and law seems contrary to the core purpose of the policy itself.   If lending was an important rather than a menial activity intended to be excluded, one would have expected a clear exclusion from coverage.   But none seems to exist or to have

been agreed on.  The parties cite to conflicting caselaw in support of irreconcilable results.  Like with the "I v. I" exclusion, the issue ends up surrounded by ambiguity.

### c.  Disposition

In W Holding Company, the First Circuit identified the lack of controlling authority as to the scope of an exclusion, pointing out that in the end, the insurer could still prevail at trial.  See, 748 F.3d at 386 (so ruling).  In consequence, ambiguity - without more - does not mean that the insured prevails.  Instead, it calls for extrinsic evidence.  See, St. Paul Mercury Insurance, 774 F.3d at 710 (remanding the case after concluding that the exclusion was ambiguous, for the trial court to consider, if necessary, extrinsic evidence to determine the parties' intent).  In this way, "appropriate extrinsic evidence, may be found to show that the unfavorable interpretation was the one reasonably understood by both parties."  Commercial Insurance Co., of Newark, N.J. v. González, 512 F.2d 1307, 1310 n.7 (1st Cir. 1975).  Nevertheless, "when an ambiguity finally remains … it is to be construed against the [insurer]."  Id.

Relying on the deposition testimony of Mr. Ty Sagalow - whom they presented as an expert on industry custom and practice – the Insurers maintain that the "I v. I" and "PS" exclusions are unambiguous and should be read as such, to deny coverage.  Mr. Sagalow's testimony does not –in the court's view – adequately explain the lack of clarity in language necessary to overcome the ambiguity that surrounds the exclusions in the context of this litigation.  He admitted lack of specific knowledge of what Liberty intended or of what the Directors intended, and did not read any documentation on the issue from either Liberty or the Directors (Docket No. 482-3, Exh. A, pp. 67-68, 73, 233-234 of the deposition transcript).  While Mr. Sagalow's deposition testimony will not be struck as the FDIC and Arrillaga request at Docket No. 283, the testimony is insufficient to support summary judgment for Liberty or ACE.

### d.   *Excess Coverage*

XL states it is under no obligation to provide coverage until Liberty's and ACE's policies are exhausted by payments of the full limits of liability by those insurers (Docket No. 365-1, p. 6). The FDIC posits that XL's and Liberty's policies are mutually repugnant and negate each other out, leaving both policies in a co-primary position (Docket No. 399 at p. 1).   It argues that "XL's repeated labeling of the Liberty policy as 'primary' while designating its policy as 'excess' is just a word game aimed at selling an interpretation unsupported by the actual language of the policies whose terms plainly reveal that Liberty and XL covered the same risk and the same loss at the same level of coverage" (Docket No. 476 at p. 3).

Primary coverage provides the insured's initial layer of protection against liability and loss. MetLife Capital Corp. v. Westchester Fire Ins. Co., 224 F.Supp.2d 374, 382 (D.P.R. 2002).  Excess or secondary coverage is coverage whereby liability attaches only after policy limits of the primary coverage have been exhausted.  Id.  Umbrella coverage is a kind of excess insurance.  They differ from standard excess policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage).   The vertical coverage provides additional coverage above the limits covered by all underlying insurance, whereas horizontal coverage serves as a gap filler that drops down to provide primary coverage for situations or occurrences not covered at all by the underlying insurance. Id. at 382-383.

XL characterizes its policy as an excess policy providing umbrella coverage to the Directors because it provides (1) coverage after exhaustion of the underlying insurance or indemnification, or (2) drop down coverage in the event such insurance or indemnification does not apply (Docket No. 447 at pp. 4-5).  The FDIC takes issue with XL's characterization, pointing

out that the Liberty policy and the XL policy contain conflicting "other insurance" clauses subjecting both insurers to primary-coverage exposure.

"Other insurance" clauses attempt to define the insurer's responsibility for payment when other insurance coverage is available. Horace Mann Ins. Co. v. General Star Nat. Ins. Co., 514 F.3d 327, 330 (4th Cir. 2008). Originally, the clauses appeared in property insurance policies and were intended to eliminate the problem of fraudulent claims induced by over-insuring. Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 60 (1st Cir. 2000). In a context such as the one here, the clauses function not so much as to deter fraudulent claims as simply to limit an insurer's exposure where the insured happens to hold multiple insurance policies covering the same loss. Id. at 60-61; Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, 957 (17th ed. 2015). There are three types of "other insurance" clauses: (1) the "escape" clause, which denies coverage for a claim if other insurance is available; (2) the "pro rata" clause, which extends coverage to a portion of the total loss claimed, usually based on the limits of the applicable policies; and (3) the "excess" clause, which extends coverage only to the extent that other available insurance is insufficient to cover the claim. Home Ins. Co., 229 F.3d at 61; Ostrager & Newman, supra, at pp. 961-962.

In some cases, the clauses are not difficult to interpret and apply. If a claim were covered by two policies each with *pro rata* clauses, then each of the insurers would pay a *pro rata* share of the claim. Home Ins. Co., 229 F.3d at 61. Similarly, if one policy contained no "other insurance" clause at all while the second carried an excess clause, then the first policy would covers the claim and, if it were insufficient, the second would cover the excess. Id. In other cases, however, different policies contain "other insurance" clauses that are incompatible in the sense that, if each is given full effect, claims covered by both polices will go under-insured. Id. If the first policy

provided coverage only in excess of the second and the second provided coverage only in excess of the first, the result would be a standoff if each insurer refused to cover the claim before the other. Id.

To break the impasse, many courts, including the Puerto Rico Supreme Court, eventually adopted the doctrine of mutual repugnancy, under which two insurers' excess clauses are thought to cancel each other out, and the insurers are made to split the costs of coverage themselves on a pro rata basis according to the amounts of the policies. See, Wright-Ryan Construction v. AIG, 647 F.3d 411, 415 n.2 (1st Cir. 2011)(stating that "[a] finding of mutual repugnancy would typically result in two insurers sharing coverage of the claimed loss pro-rata"); Monteagudo-Pérez v. E.L.A., 172 D.P.R. 12, 23-24 (2007)(adopting mutual repugnancy doctrine in Puerto Rico). The FDIC contends that the Liberty and XL policies are on equal footing in a co-primary position, because both policies contain other insurance "excess" provisions. So it claims that primary responsibility must be prorated between Liberty and XL (Docket No. 399 at pp. 5-6).

A primary liability policy that contains an excess "other insurance" clause may operate as an excess policy if other insurance is available. Horace Mann Ins. Co., 514 F.3d at 330. That is, even though the policy would provide primary, first dollar coverage for an insured loss if no other insurance policy covered the loss, it will provide excess coverage when other insurance is available. Id. Primary liability policies with excess other-insurance clauses are sometimes referred to as "coincidental excess" policies. Id. "True excess" or "pure excess" distinguishes typical excess liability policies from coincidental excess policies. Id. at p. 332-333.

The Liberty policy provides that it shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise,

unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number (Liberty Policy at ¶ 14).  The FDIC asserts this last proviso is not satisfied, because XL never identified Liberty's policy as the underlying policy (Docket No. 399 at pp. 5-6; Docket No. 476 at p. 2).[40]

"Specific excess insurance" consists of insurance providing coverage only in excess of some other specifically identified policy.  See, Home Ins., 229 F.3d at 62 n.7 (so defining).  XL's Policy states that "[t]he Insurer will pay on behalf of the Insured Persons Loss … except to the extent that such Loss is paid by any other Insurance Program or as indemnification from any source."  Additionally, it indicates that the Insured Persons and the Company understand and agree that coverage shall be specifically excess over, and shall not contribute with "any Insurance Program maintained by the Company or any Outside Entity, whether such other insurance is stated to be primary, contributing, excess or otherwise."  Nevertheless, "if Loss is not paid by such other insurance or as indemnification [XL's] Policy will respond on behalf of the Insured Persons, subject to all of its terms, conditions … and limitations of the Policy." In turn, Insurance Program means, "any existing Management Liability Insurance, Directors' and Officers' Liability Insurance, or similar insurance" as well as "any other existing insurance under which coverage may be owed."

The FDIC claims that as a whole, both policies simply seek to place initial loss on any other applicable insurance, saving for itself a role as secondary insurer in a situation of mutual repugnancy sufficient to trigger Monteagudo-Pérez (Docket No. 399 at p. 6).  But the instant case has not brought out that problem, for Liberty has not sought to avoid coverage on the "other-

---

[40]  It states that had XL done so, the "other insurance provision in the Liberty policy, by its explicit terms, would not have applied to XL, and . . .  [the parties] would not be having this argument" (Docket No. 476 at p. 2).

insurance" clause or by claiming it is something other than a primary insurer in this litigation. Primary insurers provide the first layer of insurance coverage, and for the same reason, are first responsible for defending the insured in the event of a potentially covered occurrence or claim. Horace Mann Ins. Co., 514 F.3d at 334-335.  And Liberty is advancing defense costs (Docket No. 353).

In consequence, even though a primary liability insurance policy may in fact provide only excess liability coverage under certain circumstances (id. at 330), such is not the case here.  The policies do not apply at the same level of coverage.[41] There is no priority dispute between insurers. In effect, mutual repugnance does not exist.  Hence, primary insurance must be exhausted before coverage under the excess policy is due.  Id. at p. 334.  With that in mind, XL need not respond to the making of a claim against Insured Persons unless and until the underlying policies are exhausted or determined not to apply.

## G.  Third-Party Affidavits/Depositions

The FDIC contends Arrillaga procured sworn statements under penalty of perjury ("affidavits") from several witnesses that he had subpoenaed for deposition, cancelled the depositions, and kept the affidavits hidden from the FDIC.  So it asks that Arrillaga be prohibited from using the affidavits (Docket No. 534 at p. 1).  Arrillaga claims the affidavits are not discoverable, and that the FDIC could have timely obtained them but did not (Docket No. 360 at p. 17).

Rule 26(a)(1) of the Federal Rules of Civil Procedure requires the parties to, without awaiting a discovery request, provide to the other parties a copy or description by category and

---

[41] Liberty does not contest this point.

location of all documents that the disclosing party has in its possession, custody, or control and may use to support its claims and defenses. The only exceptions to this requirement are documents which would be used solely for impeachment under Rule 26(a)(1)(A)(ii).

Disclosures must be kept current. Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003). Thus, Rule 26(e) imposes an ongoing duty to supplement initial disclosures in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made available to the other parties during discovery or in writing. Id. The duty extends past the discovery cut-off date.

Arrillaga procured the affidavits, and did not produce them.[42] Yet he argues the affidavits are not "documents" within the meaning of Rule 26 because they are anticipated oral trial testimony (Docket No. 360 at pp. 6-7, 9). The FDIC contests Arrillaga's understanding of what a document is, pointing out that courts are to interpret liberally the discovery provisions of the Federal Rules of Civil Procedure "to encourage the free flow of information among litigants," Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd, 333 Fed.3d 38, 41 (1st Cir. 2003), and that rather than encourage such a flow, Arrillaga's interpretation would hinder it (Docket No. 383 at p. 6).

Having reviewed the cases cited by the parties and conducted its own research, the court concludes that affidavits are documents subject to disclosure within the constraints of the Federal Rules of Civil Procedure. As a sister court in this District pointed out, Fed.R.Civ.P. 26(b)(1)(C) contemplates "any written statement made by a potential witness for trial." Hernández Carrasquillo v. Municipality of Ceiba, 2005 WL 1847007, *3 (D.P.R. Jul. 29, 2005). Likewise, a

---

[42] The exact number of statements is unknown.

majority of courts have required "disclosure of witness affidavits prepared in anticipation of litigation" under Rule 26(b)(3).  See, Basaldu v. Goodrich Corp., 2009 WL 1160915, *1 (E.D. Tenn. Apr. 29, 2009)(so noting).  In the absence of a textual or clear policy statement requiring otherwise, the court finds it persuasive that affidavits are a recognizably discoverable "document" under different provisions of the same rule.

Arrillaga contends the affidavits are attorney work-product that need not be produced (Docket No. 360 at p. 11).  The work product doctrine serves to ensure that an attorney may properly prepare his client's case with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.  Hickman v. Taylor, 329 U.S. 495, 510-511 (1947).  It is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure.  As such, it protects (1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; (3) by or for another party or by or for that other party's representative, protecting the mental impressions, conclusions, or legal theories of a party's attorney concerning the litigation.  Fed.R.Civ.P. 26(b)(3).

Moving from the general to the particular, not all written materials obtained or prepared by and adversary's counsel with any eye toward litigation are necessarily free from discovery in all cases.  Third-party affidavits are normally not immune from disclosure for the very reason that an affidavit purports to be a statement of facts within the personal knowledge of the witness, and not an expression of opinion of counsel.  See, Tuttle v. Tyco Electronics Installation Services Inc., 2007 WL 4561530, *1 (S.D. Ohio Dec. 21, 2007)(so noting in ordering production of third-party affidavits); Basaldu, 2009 WL 1160915 at *1 (requiring production of affidavits because "[a]n attorney's memorialization of events, effectively acting as a stenographer, does not fall within the sphere of documentation protected by the work product privilege"); Ford Motor Co. v. Edgewood Properties, Inc., 257 F.R.D. 418, 422 (D.N.J. 2009)(compelling disclosure of affidavit in light of

the fact that for the court, primary purpose of work product doctrine is "to protect counsel's trial strategies and mental impressions, not its choice as to an affiant's testimony of underlying facts").

Regardless of whether affidavits are appropriately withheld as attorney work product, however, the withholding party must briefly describe the information withheld.  6 *Moore's Federal Practice*, 26-454 (Mathew Bender 3d ed.).  To that end, Rule 26(b)(5) of the Federal Rules of Civil Procedure states that when a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must expressly make the claim; and describe the nature of the documents, communications, or tangible things not produced or disclosed, and do so in a manner that , without revealing information itself privileged or protected, will enable other parties to assess the claim.  Fed.R.Civ.P. 26(b)(5).  General objections do not suffice.  Wright, Miller & Marcus, *Federal Practice and Procedure*, 317, 321-322 (2010).[43]  Arrillaga never provided a privilege log with a sufficient factual basis for asserting any privilege with respect to the affidavits (at least the court has seen none).

A party who withholds privileged documents without complying with Rule 26(b)(5) is subject to sanctions under Rule 37.  Taydus v. Cisneros, 902 F.Supp. 288, 297 (D. Mass. 1995); 6 *Moore's Federal Practice*, supra at p. 26-496.  On that basis, Rule 37(c)(1) provides in part that if a party fails to provide information required by Rule 26(a) (including a description by category and location of documents that the party may use to support its claims or defenses), or 26(e), the party is prohibited from using that information to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.  Fed.R.Civ.P. 37(c)(1).

---

[43] The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection.  See, Fed.R.Civ.P. 26(b)(5), Advisory Committee Notes, 1993 Amendments.  Nevertheless, sufficient information must be provided to permit the court and opposing counsel to determine whether the privilege asserted applies to each of the documents in question.  Failure to supply that information may result in a denial of the privilege relied on to resist production.  See, Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 594 (W.D. N.Y. 1996)(so holding in context of a privilege log).

Arrillaga alleges that the identities of the affiants were known to the FDIC, and that the FDIC could have attempted to locate and interview them (Docket No. 360 at pp. 11-12). He points out that the FDIC knew of the existence of witness statements not later than October 2, 2014, nearly two weeks before the discovery cut-off date, and could have, but did not, schedule depositions of any witness it desired to depose. Id. at p. 15. He adds that the FDIC notified all parties that it intended to subpoena four witnesses for affidavits, sworn statements and unsworn statements hence by that date, the existence of witnesses statements had otherwise been made known to the other parties during the discovery process or in writing as required by Fed. R. Civ. P. 26(e)(1)(A). Id. at p. 13. Therefore, he characterizes his decision to withhold disclosure as both "substantially justified" and "harmless." Id. at p. 16.

The FDIC represents –and Arrillaga does not seriously dispute– that on September 3, 2014, Arrillaga served notice of intent to take twenty-two fact depositions and two expert depositions over the course of the final twenty-eight calendar days of discovery (Docket No. 354 at p. 2). Two days later, he served an amended notice eliminating one of the expert depositions, leaving a total of twenty-three depositions scheduled. Id. at pp. 2-3. On September 9, 2014, Arrillaga supplemented his initial disclosures, listing fifty-four new potential witnesses. Id. at p. 3. After the depositions began, he canceled the depositions of twelve out of the twenty-two depositions he originally noticed. Id.

On October 14, 2014, the day before the discovery deadline, the FDIC seems to have learned that Arrillaga took affidavits from several of the fact witnesses in lieu of the depositions he had originally scheduled and subsequently canceled. Id. The FDIC attempted to contact the third-party witnesses whose depositions had been canceled. Not all of them were reached. Id. Four of the witnesses verbally expressed that they had executed and delivered affidavits to

Arrillaga but did not produce these to the FDIC. Id. On October 15, 2014, at 5:35 p.m., the FDIC served upon Arrillaga a Request for Production of the affidavits. Id. at p. 3. On November 14, 2014, Arrillaga responded by serving objections to the FDIC's Request stating it was untimely, and invoking without explaining, the attorney work product doctrine to prevent disclosure. Id. at p. 4.

The sequence of events persuades the court that Arrillaga should have supplemented his disclosures with an adequate privilege log. Supplementation does not require affirmative action by the opponent. The duty to supplement exists irrespective of requests for updates or of the fact that the other party's attorney does not know about any such information. 6 *Moore's Federal Practice*, supra at pp. 26-584-26-584.1. That the FDIC may have suspected or partially confirmed that Arrillaga had procured the affidavits is no excuse, because proof that a party was aware in the abstract of the existence of some piece of information that was not made known through discovery or in writing in the case, does not excuse a party from supplementing. See, Se-kure Controls, Inc. v. Vanguard Products Group, Inc., 2007 WL 781253, *10 (N.D. Ill. Mar. 7, 2007)(so recognizing).

The baseline for noncompliance under Rule 37(c)(1) is mandatory preclusion. See, Santiago-Díaz v. Laboratorio Clínico y De Referencia Del Este And Sara López, M.D., 456 F.3d 272, 276 (1st Cir. 2006)(so noting); Gilmore v. Stalder, 2008 WL 2097162, *4 (W.D. La. May 16, 2008)(striking affidavits for failure to produce them during discovery). But the remedy must be tailored to the wrong, and eschews mechanical application. 6 *Moore's Federal Practice*, supra at p.26-496. Considering the discovery dynamics here, the court will not preclude Arrillaga from using the affidavits.

The affidavits were prepared during the last days of discovery, and contrary to the situation in other cases, their existence was not kept secret from the other party for a significant period.[44] Similarly, there is no indication that the timing chosen to draft the affidavits (to coincide with the last days of discovery) was part of an obstructionist strategy. The identity of the potential declarants seems to have been known to the FDIC, albeit not the fact –at least not initially– that affidavits had been procured with respect to all third parties whose depositions had been cancelled close to the discovery window.

At the same time, trial must be "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest possible extent." United States v. Procter & Gamble Co., 356 U.S. 677, 682-683 (1958). In line with the procedural setting of the dispute, Arrillaga shall submit the affidavits for *in camera* inspection not later than September 9, 2016, with a privilege log to facilitate review. The party asserting work product protection has the burden of establishing that the doctrine applies. 6 *Moore's Federal Practice*, supra, at 26-454. If the affidavits are factual, the court will order that they be produced to the FDIC.

## IV.   CONCLUSION

In view of the foregoing:

1.    The FDIC-R's "Motion of the Federal Deposit Insurance Corporation to Strike Certain Defenses Raised by the Director Defendants" (Docket No. 54) is DENIED AS MOOT.

2.    The FDIC-R's "Motion for Partial Summary Judgment" (Docket No. 364) is GRANTED IN PART AND DENIED IN PART.

---

[44] *Compare with* Reyes-Santiago v. JetBlue Airways Corp., 932 F.Supp.2d 291, 298 (D.P.R. 2013), where the defendant withheld a report for over eight months instead of coming forward and timely claim the privilege.

3.      Arrillaga's Motion for Summary Judgment relating to the Statute of Limitations and Causation" (Docket No. 378) is DENIED.

4.      Arrillaga's "Motion for Partial Summary Judgment as to the Jocar Loan" (Docket No. 367) is DENIED.

5.      Arrillaga's "Motion for Partial Summary Judgment based on the FDIC's Admissions and Representations as to the Acor, Marat, and City Walk Loans" (Docket No. 369) is DENIED.

6.      "FDIC-R's Motion to Preclude Rafael Arrillaga-Torréns from using Certain Affidavits obtained in Lieu of Depositions "(Docket No. 354) is DENIED.

7.      Codefendants Gómez-Cuétara's and Gil-Gómez de Liano's "Motion to Dismiss Complaint as to Co-defendant Rocío Gil-Gómez de Liano" (Docket No. 507) is DENIED AS MOOT.

8.      "Liberty Mutual Insurance Company's Motion for Judgment on the Pleadings" (Docket No. 73) is DENIED.

9.      "Liberty Mutual Insurance Company's Motion to Strike the FDIC-R's Sur-reply to Liberty's Motion for Judgment on the Pleadings" (Docket No. 118) is DENIED.

10.     "Liberty Mutual Insurance Company's Motion to Strike the Director Defendants' Surreply to Liberty's Motion for Judgment on the Pleadings (Docket No. 122) is DENIED.

11.     "FDIC-R's Motion for Partial Summary Judgment against Liberty Mutual Insurance Company and ACE Insurance Company" (Docket No. 358) is GRANTED.

12.     "XL Specialty Insurance Company's Motion for Partial Summary Judgment" (Docket No. 365), which the FDIC-R opposed (Docket No. 399) is GRANTED.

13.     "Federal Deposit Insurance Corporation as Receiver for Eurobank's Opposition to Liberty Mutual Insurance Company and ACE Insurance Company's Motion for Summary Judgment" (Docket No. 404) is NOTED.

14.      "Liberty Mutual Insurance Company and ACE Insurance Company's Joint Motion to Strike" [the FDIC-R's Sur-reply at Docket No. 482] (Docket No. 487) is DENIED.

**SO ORDERED**.

In San Juan, Puerto Rico, this 26th day of August, 2016.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge